Susan RACHLIN, Appellant

v.

David R. EDMISON, M.D., Frcs, Focus Eye Centre, 20/20 Laser Centers [Appellee], Richard B. Prince, M.D., F.A.C.S., Tri–County Eye Physicians & Surgeons, P.C.

Superior Court of Pennsylvania.

Argued Sept. 5, 2002.

Filed Dec. 13, 2002.

Bernard W. Smalley, Philadelphia, for appellant.

Stephen J. Poljak, Pittsburgh, for 2020 Laser Center, appellee.

Before: McEWEN, P.J.E., JOHNSON, HUDOCK, FORD ELLIOTT, ORIE MELVIN, TODD, KLEIN, BOWES and GRACI, JJ.

HUDOCK, J.

██ ¶ 1 This is an appeal from the judgment[1] entered in favor of 20/20 Laser Centers, Inc. (20/20 Laser Centers)[2] and against Susan Rachlin (Ms. Rachlin) in a medical malpractice action. We affirm.

¶ 2 The pertinent facts and procedural history may be summarized as follows: In the Spring of 1995, Ms. Rachlin, a long-term contact lens wearer, was referred to Harleysville Eye Associates (Harleysville) by her regular eye doctor because she had been experiencing "redness, discomfort and itching in both eyes with contact lenses" and wanted to be evaluated for laser surgery that would eliminate her need for corrective lenses. Complaint, 10/27/97, at ¶ 20. At Harleysville, George E. White, III, M.D. (Dr. White), examined her. Dr. White in turn referred Ms. Rachlin to Tri-County Eye Physicians and Surgeons (Tri-County) so that Richard B. Prince, M.D. (Dr. Prince) could perform several corneal topographies on her eyes, a necessary prerequisite to the laser procedure. After these topographies were completed and evaluated, Ms. Rachlin underwent a bilateral photo-refractive keratectomy (Laser PRK) on August 25, 1995, which was performed by David R. Edmison, M.D. (Dr. Edmison) in Ottowa, Ontario, Canada, at the Focus Eye Centre.

¶ 3 As described by the trial court, "Laser PRK is a procedure that was popular in the mid–1980's to improve the vision of eyeglass- or contact-lens-wearer[s] to the point where corrective lenses would no longer be required. It has since been largely supplanted by Lasik®, a similar type of procedure." Trial Court Opinion, 11/14/00, at 2 n.1. At the time of Ms. Rachlin's procedure, the FDA had not approved Laser PRK as a procedure to be used in the United States.

¶ 4 After the first surgery, she returned to the care of Dr. White at Harleysville. About six months later, however, Ms. Rachlin, believing that her eyesight had not been sufficiently corrected by the first procedure, came under the care of Dr. Prince. In May of 1996, Dr. Prince performed a second Laser PRK procedure on her at the offices of 20/20 Laser Centers in Plymouth Meeting, Pennsylvania. By the

1. Ms. Rachlin purportedly appeals from the December 14, 2000, order denying her post-trial motion. "[A]n order denying post-trial motions is not appealable until the order is reduced to judgment." *Parker v. Freilich*, 803 A.2d 738, 741 n. 2 (Pa.Super.2002). The appeal in this case properly lies from the judgment entered on December 14, 2000, rather than the order entered on that same date.

2. During this litigation, 20/20 Laser Centers was renamed The Laser Center (Northeast) Inc. We shall continue to refer to the entity as 20/20 Laser Centers.

time of the second surgery, the Laser PRK procedure had gained FDA approval and was available in the United States.

¶ 5 According to Ms. Rachlin's complaint, the second Laser PRK procedure significantly worsened her vision. Complaint at ¶ 28. Thus, on August 21, 1997, she commenced the instant action against Dr. Edmison, Focus Eye Centre, Dr. Prince, Tri–County and 20/20 Laser Centers. Significantly, neither Dr. White nor Harleysville were named as defendants. According to the trial court, Ms. Rachlin requested and received Dr. White's treatment records in April of 1998.

¶ 6 The initial report of Ms. Rachlin's expert, Wayne F. Bizer, D.O. (Dr. Bizer), was dated April 27, 1999. In the report, Dr. Bizer stated that he had reviewed Ms. Rachlin's medical records from Dr. Edmison and Focus Eye Centre, 20/20 Laser Centers, Dr. Prince and Tri–County, as well as from Dr. White and Harleysville. Dr. Bizer's report mentioned Dr. White only when summarizing the history of the laser procedures and made no criticism whatsoever of his care:

> Ms. Rachlin is a 38 year old woman who began experiencing redness, discomfort, and itching in both eyes with contact lenses in April, 1995. Her best-corrected visual acuity was 20/30 in the right eye and 20/20 in the left eye. On August 25, 1995, a[PRK] was performed by Dr. Edmison at Focus Eye [Centre] in Canada, through 20/20 Laser Centers. *Her [post-operative] care, including the administration of antibiotics, steriods, and NSAID eye drops, was performed by Dr. George White at [Harleysville].* Following the surgery, [Ms. Rachlin] developed corneal hazing and edema, central island formation, regression, and undercorrection.
>
> In February of 1996, Dr. Prince took over Ms. Rachlin's eye care and re-initi-
>
> ated steroid eye drops. On May 17, 1996, Dr. Prince performed a PRK enhancement of the right eye following consultation with Dr. Brint. [Post-operatively], Ms. Rachlin's vision was significantly impaired.
>
> Based upon my review of the records, I believe to a reasonable degree of medical certainty, subject to the completion of depositions, that there could be a deviation in the standard of care by Dr. Prince in several aspects. First, it is possible that Dr. Prince deviated from the standard of care by performing a PRK enhancement on Ms. Rachlin. Second, it is possible that Dr. Prince deviated from the standard of care by failing to fully and accurately inform consulting physicians of Ms. Rachlin's [post-operative] treatment including the administration of [post-operative] eye drops.
>
> I believe that Dr. Prince's possible deviations in the standard of care resulted in Ms. Rachlin's impaired vision as well as the inability to correct her visual acuity with glasses or contact lenses. I also believe that it is possible at this point that Dr. Prince's deviations in the standard of care increased Ms. Rachlin's risk of suffering visual impairments.

Report, 4/27/99, at 1–2 (emphasis added). Dr. Bizer further stated that he would "reserve [his] opinions with respect to additional negligence and causation on the part of Dr. Prince as well as opinions as to the negligence of 20/20 Laser Centers until the completion of all scheduled depositions." *Id.* at 2.

¶ 7 On May 25, 1999, Ms. Rachlin took Dr. White's deposition, at which Dr. White was unrepresented by counsel. On June 15, 1999, the trial court granted 20/20 Laser Centers partial summary judgment "[a]s to the alleged negligence which occurred on August 25, 1995 [the first sur-

gery]" based upon Ms. Rachlin's failure to establish a *prima facie* case of negligence with regard to that procedure.

¶ 8 Notwithstanding her failure to assert any claim in her complaint arising from the conduct of Dr. White, and the trial court's order of June 15, 1999, Ms. Rachlin produced a second expert report from Dr. Bizer after he had reviewed additional medical records, including a Summit Technology Calibration Log, a June 1, 1998, report of Stephen Orlin, M.D., as well as the depositions of Drs. White and Prince. In this report, Dr. Bizer, for the first time, opined Ms. Rachlin's eye problems were caused by Dr. White's administration of anti-inflammatory drugs following the first surgery:

Based upon my review of the additional materials, it is my understanding that Ms. Rachlin paid a one-time universal fee to [20/20 Laser Centers] for her preoperative, operative and [post-operative] care following her initial PRK surgery. Further, no monies were ever paid by [Ms. Rachlin] to [20/20 Laser Centers'] co-managing optometrist, [Dr. White], for his post-operative care. It is also my understanding that optometrists and ophthalmologists involved in the care of post PRK patients were to receive training by [20/20 Laser Centers] and to receive certificates following their training.

Based upon this payment of the one-time universal fee to [20/20 Laser Centers], Ms. Rachlin received post PRK operative care from [Dr. White] and [Dr. Prince] as co-managing optometrist and ophthalmologist respectively. It was based upon this relationship that [Ms. Rachlin] sought post-operative PRK care from Dr. White and Dr. Prince.

Specifically, Dr. White, in his capacity as [20/20 Laser Centers'] co-managing optometrist, made the following errors in the post-operative care provided to Ms. Rachlin under this agreement:

1. Following the August 1995 PRK surgery, he continued the post-operative non-steroidal anti-inflammatory eye drop Voltaren for much longer than the 2 or 3 days that it should have been used. Prolonged usage of topical non-steroidal anti-inflammatory medications is known to cause regression of the visual outcome from PRK[.]

2. He pre-maturely [sic] and abruptly discontinued the topical steroid therapy after barely more than one month after her PRK treatment. The early and abrupt termination of ocular steroids is known to cause regression of the visual outcome from PRK.

Ms. Rachlin did suffer an under-correction from her first PRK surgery that within a reasonable degree of medical certainty could have been prevented had the post-operative medications been used in accordance with accepted standards of care. It appears that Dr. White, as the co-managing optometrist for [20/20 Laser Centers], did not receive training from [20/20 Laser Centers] until after he rendered care to Ms. Rachlin. This under-correction required a second surgery to correct her vision. As a result of the second surgery on Ms. Rachlin's right eye, she has sustained a worsening of her vision[.]

\* \* \*

It is my opinion, within a reasonable degree of medical certainty, that [20/20 Laser Centers], through its co-managing optometrist, [Dr. White], deviated from the standard of care in the case of Ms. Rachlin and that these deviations directly caused and/or lead

to Ms. Rachlin's worsening visual problems[.]

Report of Wayne F. Bizer, D.O., 7/7/99, at 1–2.

¶ 9 By the time of trial, 20/20 Laser Centers remained the only defendant in this medical malpractice action. A motion for summary judgment filed by Dr. Prince and Tri–County was granted by order dated November 15, 1999, on the basis that Dr. Bizer's supplemental expert report stated that the care rendered by Dr. White, rather than Dr. Prince and/or Tri–County, deviated from the pertinent standard of care. Earlier, the preliminary objections of Dr. Edmison and Focus Eye Centers were granted, and they were dismissed from the suit.

¶ 10 Prior to trial, counsel for 20/20 Laser Centers filed a motion *in limine* to preclude the report and testimony of Dr. Bizer because his opinions were at variance with the allegations contained in Ms. Rachlin's complaint. Following oral argument on November 23, 1999, the trial court granted 20/20 Laser Centers' motion. The next day, the court denied Ms. Rachlin's request for reconsideration, and Ms. Rachlin waived her right to a jury trial. Immediately thereafter, counsel for Ms. Rachlin presented her proposed evidence in summary fashion, and, following 20/20 Laser Centers' motion therefor, the trial court granted 20/20 Laser Centers a compulsory non-suit.

¶ 11 Ms. Rachlin's appeal to this Court followed the denial of her timely motion to remove the non-suit. In the appeal, she claimed that the trial court improperly granted 20/20 Laser Centers' motion *in limine* to preclude the testimony of Dr. Bizer. Following oral argument, a divided panel of this Court quashed Rachlin's appeal as untimely filed. The panel majority, citing *Bostick v. Schall's Brakes and Repairs, Inc.*, 725 A.2d 1232 (Pa.Super.1999), reasoned that Ms. Rachlin should not have filed a post-trial motion seeking to remove the non-suit because the order granting non-suit was filed with regard to proceedings which did not constitute a trial. The panel majority further reasoned that the parties' stipulation that post-trial motions could be filed did not alter the result. According to the panel majority, if the parties were permitted to "convert" their prior oral argument on the motion *in limine* to a bench trial, the entry of compulsory non-suit would have been improper because 20/20 Laser Centers had offered evidence into the record. *See generally Deiley v. Queen City Business Center Associates*, 757 A.2d 956 (Pa.Super.2000). Thus, the panel majority concluded that, because Ms. Rachlin did not file her appeal within thirty days from the entry of the compulsory non-suit, her appeal was untimely.

¶ 12 The dissent concluded that Ms. Rachlin's appeal was timely because a careful review of the record revealed that 20/20 Laser Centers made its motion for compulsory non-suit at the close of Ms. Rachlin's presentation of her evidence in a non-jury trial. According to the dissent, the panel majority's reliance on *Bostick* was misplaced since the equivalent of a partial trial had taken place when the non-suit motion was made. The dissent demonstrated that Ms. Rachlin presented her evidence in summary fashion via counsel and that 20/20 Laser Centers presented no evidence prior to its request for a compulsory non-suit. Thus, the dissent concluded that her appeal was properly before the panel and her substantive issue should have been addressed.

¶ 13 Thereafter on March 4, 2002, Rachlin filed a petition for *en banc* reargument in which she challenged the panel majority's conclusion that her appeal was untimely. Ms. Rachlin's petition was granted and

thus the issue of the timeliness of her appeal and the propriety of the compulsory non-suit are presently before this En Banc Court.

■ ¶ 14 Initially, unlike the panel majority, we conclude that Rachlin's appeal was timely and properly filed following the denial of her post-trial motion to remove the non-suit. Moreover, we agree that *Bostick* is inapposite as it involved the grant of non-suit pursuant to Rule 218 of the Pennsylvania Rules of Civil Procedure and a situation where a party did not appear for trial. The holding in *Bostick* must be limited to the facts presented therein and cannot be found to apply to a situation where a compulsory non-suit was granted after trial of a case, whether in the traditional manner or by summary fashion, has begun. *See Liles v. Balmer*, 439 Pa.Super. 238, 653 A.2d 1237, 1240 n. 5 (1995) (concluding that the appeal properly followed the denial of the plaintiff's motion for reconsideration of the trial court's grant of compulsory non-suit based upon plaintiff counsel's indication, after trial began, that the court's prior evidentiary ruling precluded him from proceeding further in the case); *Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 664 A.2d 159, 161 (1995) (explaining that an appeal lies not from the entry of a compulsory non-suit, but from the trial court's refusal to remove it). Thus, we shall consider the merits of Rachlin's claim that the trial court erred in denying her request for removal of the non-suit because it erroneously granted 20/20 Laser Centers' motion *in limine* to preclude the testimony of her expert, Dr. Bizer.

■ ¶ 15 As this Court has recently summarized:

A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff['s] evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury. When this Court reviews the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered.

*A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff.*

*Parker v. Freilich*, 803 A.2d at 744–45 (Pa.Super.2002) (emphasis added) (citing *Hong v. Pelagatti*, 765 A.2d 1117, 1121 (Pa.Super.2000)) (citations and quotation marks omitted). "An order denying a motion to remove a compulsory nonsuit will be reversed on appeal only for an abuse of discretion or error of law." *Alfonsi v. Huntington Hospital, Inc.*, 798 A.2d 216, 218 (Pa.Super.2002) *(en banc)* (citation omitted).

■ ¶ 16 As this Court has also recently reiterated:

In the context of actions for medical malpractice, the plaintiff must establish that (1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of the duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the damages suffered by the patient were a direct result of that harm.

*Dietzel v. Gurman,* 806 A.2d 1264, 1268 (Pa.Super.2002) (quoting *Corrado v. Thomas Jefferson University Hospital,* 790 A.2d 1022, 1030 (Pa.Super.2001)).

¶ 17 In the present case, counsel for Ms. Rachlin conceded that, without Dr. Bizer's testimony, he would be unable to establish her claim. Thus, the question becomes whether the trial court erred in granting the motion *in limine.* As this Court has stated:

> "When reviewing rulings on motion *in limine,* we apply the scope of review appropriate to the particular evidentiary matter." *Delpopolo v. Nemetz,* 710 A.2d 92, 94 (Pa.Super.1998). " 'A motion *in limine* is a procedure for obtaining a ruling on the admissibility of evidence prior to or during trial, but before the evidence has been offered.' " *Id.* [ (citation omitted) ]. In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. *Kehr Packages, Inc. v. Fidelity Bank,* 710 A.2d 1169, 1172 (Pa.Super.1998).

*Yacoub v. Lehigh Valley Medical Associates,* 805 A.2d 579, 588 (Pa.Super.2002) (*en banc* ).

¶ 18 The trial court granted the motion, reasoning that Ms. Rachlin was attempting to raise a new claim of negligence after the applicable statute of limitations had run, as well as the "inherent unfairness" of the "last-minute change" in her theory of the case. Trial Court Opinion, 11/14/00, at 6. Ms. Rachlin now claims that the trial court's grant of 20/20 Laser Centers' motion *in limine* constituted an error of law because Dr. Bizer's report provided "sufficient expert testimony to prove a prima facie medical malpractice case against [20/20 Laser Centers] for both direct liability and agency liability." Ms. Rachlin's Brief at 17. As she further argues:

Initially, Dr. Bizer's testimony supports a direct theory of liability against [20/20 Laser Centers]. Specifically, Dr. Bizer opines that [20/20 Laser Centers'] failed to provide training to their co-managing optometrist, Dr. White, that such failure was a deviation from the standard of care, and that such deviation was a proximate cause of [her] harm.

In addition, Dr. White was clearly an agent of [20/20 Laser Centers]. An agency is created when there is an [sic] manifestation by a principal that an agent shall act for him, the agent's acceptance of the undertaking, and an understanding by the parties that the principle is to be in control of the undertaking. *Ferry v. Fisher,* 709 A.2d 399, (Pa.Super.1998), *citing Clayton v. McCullough,* [448 Pa.Super. 126] 670 A.2d 710 (Pa.Super.1996). In the present case, [Dr. White] was clearly providing medical care to [Ms. Rachlin] under the contractual agreement between [20/20 Laser Centers] and [Ms. Rachlin]. In addition, [Dr. White] obviously accepted the undertaking of providing medical care to [Ms. Rachlin]. Finally, [20/20 Laser Centers] was in control of [Ms. Rachlin's] medical treatment under the agreement, including the treatment by [Dr. White]. As such, Dr. Bizer's testimony supports an agency theory of liability against [20/20 Laser Centers] for the deviations from the standard of care by Dr. White, [20/20 Laser Centers'] co-managing optometrist.

Ms. Rachlin's Brief at 17–18. Ms. Rachlin also claims that her agency theory is supported by the fact that she paid a one time global fee to 20/20 Laser Centers and argues, at the very least, the issue of whether Dr. White was an agent of 20/20 Laser Centers should have been presented to the jury. We are not persuaded by Ms. Rachlin's claims.

¶ 19 In the present case, Ms. Rachlin relies upon Dr. Bizer's characterization of the agency relationship between Dr. White and 20/20 Laser Centers as the basis for alleging error in the trial court's granting 20/20 Laser Centers' motion *in limine*. In short, Ms. Rachlin relies upon this characterization to make up for her failure to sufficiently plead an agency claim with regard to Dr. White and 20/20 Laser Centers within her complaint. As this Court has stated:

> The purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend. *McClellan v. Health Maintenance Organization of Pennsylvania,* [413 Pa.Super. 128, 604 A.2d 1053 (Pa.Super.1992) ]. A complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims. *Id.;* Pa.R.C.P. 1019(a), 42 Pa.C.S.A.
>
> * * *
>
> [I]t is not enough to focus upon one portion of the complaint. Rather, in determining whether a particular paragraph in a complaint has been stated with the necessary specificity, such paragraph must be read in context with all other allegations in that complaint. Only then can the court determine whether the defendant has been put upon adequate notice of the claim against which he must defend.

*Yacoub,* 805 A.2d at 588, 589. Moreover, "[w]hile it is unnecessary to plead all the various details of an alleged agency relationship, a complainant must allege, as a minimum, facts which: (1) identify the agent by name or appropriate description;

and (2) set forth the agent's authority, and how the tortious acts of the agent either fall within the scope of that authority, or if unauthorized, were ratified by the principal." *Alumni Association v. Sullivan,* 369 Pa.Super. 596, 535 A.2d 1095, 1100 n. 2 (1987).

¶ 20 As stated by the trial court in the present case, Dr. White's name appears nowhere in the complaint and, as late as Dr. Bizer's expert report in April of 1999, Ms. Rachlin did not consider the care rendered by Dr. White to be an issue in the case. Moreover, our reading of Ms. Rachlin's entire complaint fails to establish the agency relationship that she, via her medical expert, now asserts.

¶ 21 Paragraph 16 of the complaint speaks in general terms with regard to 20/20 Laser Centers' agents. The complaint further asserts that Dr. Prince was an agent of 20/20 Laser Centers. No similar allegation is found as to Dr. White.[3] This omission lends support to 20/20 Laser Centers' claim that Ms. Rachlin focused her lawsuit upon the second surgery performed by Dr. Prince and that she is now attempting to state a new cause of action after the applicable statute of limitations has run. Finally, a review of the following claims of negligence reveals that the focus of Ms. Rachlin's lawsuit against 20/20 Laser Centers was the surgery performed upon her:

> 46. In the care and treatment of plaintiff, defendant, 2020 Laser Centers [sic], either individually or acting through their agents, representatives, servants and/or employees

---

3. Ms. Rachlin argues that, because 20/20 Laser Centers did not request a more specific pleading with regard to her general assertion involving 20/20 Laser Centers' agents, it cannot now challenge the specificity of her complaint. We are not persuaded by this claim, however, because, given the facts of this case, Ms. Rachlin's complaint, as well as her subsequent actions in obtaining Dr. White's medical records and deposition, gave 20/20 Laser Centers no reason to believe that Dr. White's care was at issue.

was negligent in the following respects:

(a) failure to properly set the parameters of the laser utilized in performing the photorefractive keratectomy;

(b) failure to properly perform a photorefractive keratectomy;

(c) failure to correctly diagnose and treatment [sic] plaintiff's condition;

(d) failure to promptly diagnose and treat plaintiff's central island formation and under correction;

(e) failure to monitor plaintiff's condition;

(f) failure to employ adequate and appropriate techniques and procedures in rendering care to plaintiff;

(g) failure to possess the requisite skills and training to properly perform the photorefractive keratectomy;

(h) res ipsa locator [sic] in failing to properly perform the photorefractive keratectomy;

(i) increasing plaintiff's risk of harm for failing to properly perform the photorefractive keratectomy;

(j) failure to employ and retain competent and qualified physicians an/or [sic] other health care personnel;

(k) failure it in [sic] duty and obligation to plaintiff to exercise reasonable care when rendering care to patients in general and to plaintiff specifically;

(l) failure to employ physicians to possess [sic] the requisite knowledge, skill and diligence to properly render care and treatment to pa-

tients in general and to plaintiff specifically;

(m) failure to employ adequate and appropriate techniques and procedures in rendering care to plaintiff;

(n) failure to promulgate policies and procedures and/or rules and regulations to ensure quality control towards patients;

(o) increasing plaintiff's risk of harm and injury.

Complaint, at ¶ 46.[4]  *Compare Yacoub,* 805 A.2d at 589–90 (holding that compulsory non-suit improperly was granted to radiologists when an ostensible agency theory was raised in complaint, the radiologists were named as ostensible agents of hospital in complaint, and allegations of negligence clearly called into question the hospital's conduct through its radiology department; when read in its entirety, complaint sufficiently put the hospital upon adequate notice of the claim against which it must defend).

¶ 22 It is well settled that a variance between the pleadings contained in a plaintiff's complaint and the theory the party later attempts to prove at trial may result in preclusion of the new theory if it constitutes a new cause of action and is prejudicial to the defense. *Reynolds v. Thomas Jefferson University Hospital,* 450 Pa.Super. 327, 676 A.2d 1205, 1210 (1996). A proposed amendment of the complaint which adds or changes the theory of recovery upon which relief is sought through the introduction of new factual allegations generally constitutes a new cause of action. *Id.* at 1210–11. "Stated differently, an amendment proposes a different theory or a different kind of negli-

4. The next count of Ms. Rachlin's complaint essentially reiterated the above claims of negligence against Dr. Prince.

gence if the operative facts supporting the claim are changed." *Id.* at 1211.

¶ 23 In *Reynolds,* the allegations in the plaintiff's complaint in a medical malpractice action were directed toward the direct negligence of defendant Dr. Beneski, as well as the indirect negligence of the defendant hospital, with regard to the emergency intubation of the plaintiff. Subsequently, Dr. Beneski was dismissed from the action. The plaintiff's expert reports, however, criticized the care and treatment rendered by another doctor, who acted as an agent for the hospital, in the follow-up care rendered to the plaintiff. This Court found that the trial court erred in permitting the expert testimony because it changed the operative facts and thereby established a new cause of action after the expiration of the applicable statute of limitations.

 ¶ 24 As in *Reynolds,* Dr. Bizer's expert report sets forth a new cause of action based upon the post-operative care rendered by a non-party physician. *See Reynolds,* 676 A.2d at 1213 (explaining that the introduction of a new cause of action will not be permitted after the statute of limitations has run because to do so would constitute "resulting prejudice" to the adverse party); *see also Cambria–Stoltz Enterprises v. TNT Investments,* 747 A.2d 947, 953 (Pa.Super.2000) (affirming trial court's conclusion that the appellant was unable to collect damages accrued in years that were not properly pled in the complaint). Moreover, we are not persuaded by Ms. Rachlin's bare assertion that any "prejudice was cured by [20/20 Laser Centers'] submission of its own expert, rebuttal report." Ms. Rachlin's Brief at 19. As stated above, prejudice results when the variance contains a cause of action which is different from that alleged in its complaint. It is clear from a reading of her entire complaint that the claims of

negligence raised by Ms. Rachlin against 20/20 Laser Centers pertain to the care provided by Dr. Prince following the first surgery and the second surgery. The asserted negligence of Dr. White did not arise until Dr. Bizer's second expert report dated July 7, 1999. Prior to that date, however, Dr. Prince, as well as every other defendant save 20/20 Laser Centers, had been dismissed from the case. Finally, Dr. White was unrepresented during his deposition and was led by Ms. Rachlin to believe that the care he provided her was not at issue. Given these circumstances, we conclude that 20/20 Laser Centers was prejudiced to such a degree that the motion to preclude the report and testimony of Dr. Bizer was proper, as was the granting of the motion for non-suit.

¶ 25 Judgment affirmed.