John J. CACURAK, Appellee

v.

ST. FRANCIS MEDICAL CENTER, A Non Profit Corporation, and Francis T. Ferraro, an Individual and Almar Radiology and Mark Jacobson, M.D., Appellees.

Appeal of: Almar Radiology, Appellant.

Appeal of: St. Francis Medical Center and Mark Jacobson, M.D., Appellants.

John J. Cacurak, Appellant

v.

St. Francis Medical Center, A Non Profit Corporation, and Francis T. Ferraro, an Individual and Almar Radiology and Mark Jacobson, M.D., Appellees.

Superior Court of Pennsylvania.

Argued August 20, 2002.
Filed April 2, 2003.
Reargument Denied June 9, 2003.

John W. Jordan, IV, Pittsburgh, for Almar Radiology.

William R. Caroselli, Pittsburgh, for Cacurak.

Matt Horgan, Pittsburgh, for St. Francis Medical Center and Jacobson.

Before: JOHNSON, MUSMANNO and BOWES, JJ.

BOWES, J.

¶ 1 Appellants St. Francis Medical Center ("St. Francis"), Almar Radiology ("Almar"), and Dr. Mark Jacobson appeal from the judgment entered against them in the amount of $1,467,435.62 following a jury verdict in favor of John J. Cacurak, Appellee, in this medical malpractice action. Appellee has filed a cross-appeal challenging the trial court's calculation of delay damages. After careful review, we reverse and remand for a new trial.

¶ 2 The relevant facts are as follows. On August 2, 1990, Appellee underwent surgery at St. Francis to have a neurofibroma tumor removed from his spine. In order to extract the tumor, Dr. Francis T. Ferraro, the neurosurgeon who performed the operation, had to perform laminectomies, i.e., sever ligaments and remove bone, at the seventh and eighth thoracic vertebrae levels ("T–7 and T–8 levels") of Appellee's spine. As he had done on previous occasions, Dr. Ferraro asked the St. Francis radiology department to label the targeted vertebrae levels in advance so he could locate the tumor simply by looking at Appellee's back. Pursuant to Dr. Ferraro's request, Dr. Jacobson, an unsupervised second-year resident employed by St. Francis, attempted to mark vertebrae levels T–7 through T–9, but he erroneously marked levels T–5 through T–7. As a result, Dr. Ferraro made his incision in the wrong place and performed unnecessary laminectomies at the T–5 and T–6 levels before discovering the tumor and removing it.

¶ 3 Following the 1990 surgery, Appellee began to experience chest pain emanating from his thorax, the posterior chest region where the thoracic vertebrae are located. In April 1995, Appellee was referred to Dr. Alexis Shelokov, a surgeon who specializes in treating spinal deformities in adults and children. Dr. Shelokov physically examined Appellee and noted "an obvious curving or humping in his back." N.T. Trial, 12/6/00, at 19. After studying an x-ray of Appellee's spine, Dr. Shelokov determined that Appellee suffered from thoracic kyphosis, a spinal deformity caused by a loss of structural support. According to Dr. Shelokov, the x-ray showed a "70–degree kyphosis, a forward curvature of the spine." Id.

¶ 4 Dr. Shelokov attempted to alleviate Appellee's thoracic pain syndrome without performing additional surgery, but non-invasive treatment methods proved ineffective. Thus, Dr. Shelokov performed spinal fusion surgery on Appellee in April 1998 to correct the curvature in his spine. The operation was a success, and Appellee subsequently instituted this action against St. Francis and Dr. Ferraro to recover damages for pain and suffering, lost wages from 1998 until December 2000, diminish-

ed earning capacity, and medical expenses incurred in treating his kyphosis.

¶ 5 At Count I of his three-count complaint, Appellee alleged that St. Francis was vicariously liable for the radiology department's negligence in failing to mark the appropriate vertebrae levels prior to surgery. At Count II, Appellee alleged that Dr. Ferraro was negligent for failing to diagnose the tumor in a timely manner, for failing to skillfully excise the tumor, and for performing unnecessary laminectomies at the T–5 and T–6 levels. Lastly, Appellee asserted a cause of action against Dr. Ferraro for assault and battery claiming that Dr. Ferraro performed the T–5 and T–6 laminectomies without Appellee's consent. As a result of these acts and omissions, Appellee allegedly suffered incapacitating pain, back instability, impotence, restriction of physical activities, and severe emotional distress.

¶ 6 Approximately eight months after the complaint was filed, Dr. Ferraro joined Almar, a corporation that had contracted with St. Francis to operate the hospital's radiology department, as an additional defendant claiming that Almar was negligent for failing to supervise Dr. Jacobson when he marked Appellee's spine before the 1990 operation. Thereafter, Almar joined Dr. Jacobson as an additional defendant and denied responsibility for his actions on the basis that he was not an agent, servant, or employee of Almar.

¶ 7 Shortly before trial, Appellants and Dr. Ferraro moved for compulsory nonsuit claiming that Appellee had presented insufficient evidence to establish that their actions were the proximate cause of Appellee's kyphosis. After reviewing Appellee's evidence, the trial court granted the motions and subsequently denied Appellee's motion to remove the nonsuit. On appeal, we determined that the trial court properly granted a nonsuit with respect to the negligence claims asserted against Dr. Ferraro at Count II of the complaint, but found that Appellee proffered sufficient evidence to sustain the causes of action asserted at Counts I and III; accordingly, we affirmed the judgment in part, vacated in part, and remanded for trial. *Cacurak v. St. Francis,* 738 A.2d 1045 (Pa.Super.1999) (unpublished memorandum), *appeal denied,* 560 Pa. 678, 742 A.2d 670 (1999).

¶ 8 On November 29, 2000, six days before trial, Appellee reached a settlement agreement with Dr. Ferraro, and Appellants requested that Dr. Ferraro be dismissed from the action. Appellee opposed the motion to dismiss because he feared that Appellants would attempt to blame Dr. Ferraro for Appellee's injuries, but Appellants affirmatively represented that they would not present any evidence critical of Dr. Ferraro at trial. Consequently, Dr. Ferraro was dismissed from the case over Appellee's objection.

¶ 9 At trial, Dr. Shelokov testified that Almar was negligent for failing to supervise Dr. Jacobson, stating that a second-year resident should not have been permitted to mark a patient's spine for a thoracic laminectomy without an attending physician present. He explained that multilevel laminectomies such as the one performed on Appellee increase the likelihood that the patient will develop kyphosis and asserted that Almar and Dr. Jacobson were "specifically responsible" for Appellee's kyphosis because the inaccurate marking of Appellee's thoracic vertebrae prompted Dr. Ferraro to perform four laminectomies instead of two. N.T. Trial, 12/6/00, at 263. Based on his review of Appellee's medical history, Dr. Shelokov concluded that the unnecessary laminectomies caused Appellee to develop kyphosis, as evidenced by x-rays which showed that the abnormal curvature in Appellee's spine

spanned vertebrae levels T–5 through T–9, the same area where Dr. Ferraro removed bone and ligaments to gain access to the tumor.

¶ 10 St. Francis's expert witness, Dr. William Welch, offered conflicting testimony regarding the cause of Appellee's spinal deformity. Contrary to Dr. Shelokov, Dr. Welch opined that a surgeon operating on an adult patient's spinal column can remove "significant quantities of posterior bone ... without creating [spinal] instability" and that Appellee did not develop kyphosis as a result of the unintended laminectomies since Dr. Ferraro did not remove the pedicle bones or facet joints that provide structural support at the T–5 and T–6 levels. N.T. Trial, 12/15/00, at 890. In addition, Dr. Welch testified that he has performed extensive multi-level laminectomies on several patients, none of whom has developed kyphosis.

¶ 11 On December 19, 2000, at the conclusion of the eight-day trial, the jury found in favor of Appellee and awarded him $1,200,000 in damages. The jury apportioned liability as follows: St. Francis and Dr. Jacobson were found to be 35% negligent, and Almar was found to be 65% negligent. Appellee subsequently petitioned the trial court for delay damages, and Appellants filed post-trial motions requesting a new trial. On April 18, 2001, the trial court issued an order denying Appellants' post-trial motions and granting in part Appellee's petition for delay damages, thereby molding the verdict to include delay damages in the amount of $267,435.62. This appeal and cross-appeal followed.

¶ 12 On appeal, St. Francis and Dr. Jacobson raise three issues for our review. First, they contend that the trial court abused its discretion in prohibiting them from introducing evidence that after the 1990 surgery, Appellee was involved in four physical altercations that occurred in June 1992, May 1994, August 1994, and the summer of 1995. Second, they claim the trial court erred in precluding them from cross-examining Dr. Shelokov regarding prior inconsistent statements contained in his expert report. Lastly, they assert that the trial court erroneously excluded evidence that Appellee received worker's compensation benefits from 1988 through 1997 for total and partial disability in connection with an unrelated neck injury that had occurred in September 1988.

¶ 13 Similarly, Almar contends that the trial court improperly excluded evidence concerning Appellee's involvement in physical altercations that occurred after the 1990 surgery. Further, Almar claims that the trial court inappropriately permitted Appellee to bolster Dr. Shelokov's testimony by allowing Dr. Shelokov to refer to medical records compiled by Dr. Alexander Kandabarow, another physician who diagnosed Appellee with thoracic kyphosis. Finally, Almar argues that the trial court erred in permitting Appellee to cross-examine Almar's president, Dr. Stefano Bartoletti, regarding a bill submitted by Almar for services rendered by Dr. Jacobson.

¶ 14 When presented with an appeal from the denial of a motion for a new trial, our standard of review is whether the trial court committed an error of law that controlled the outcome of the case or committed an abuse of discretion. *Fanning v. Davne*, 795 A.2d 388 (Pa.Super.2002). An abuse of discretion is not merely an error of judgment; it must be shown that the law was misapplied or overridden, or that the judgment exercised was manifestly unreasonable or the result of bias, ill will, prejudice, or partiality. *Kersey v. Jefferson*, 791 A.2d 419 (Pa.Super.2002). Moreover, when a party requests a new trial

based on the trial court's evidentiary rulings, such rulings must be shown to have been erroneous and harmful to the complaining party. *Yacoub v. Lehigh Valley Medical Associates, P.C.,* 805 A.2d 579 (Pa.Super.2002). If the evidentiary rulings in question did not affect the verdict, we will not disturb the jury's judgment. *Id.; see also Detterline v. D'Ambrosio's Dodge, Inc.,* 763 A.2d 935 (Pa.Super.2000) (new trial not warranted unless erroneous evidentiary rulings affected verdict). Mindful of this standard, we begin our review with the claim that the trial court erroneously precluded Appellants from presenting evidence that Appellee was involved in four physical altercations that occurred after the 1990 surgery and prior to the 1998 spinal fusion surgery.

¶ 15 The record reveals that Appellee filed a motion *in limine* seeking to prevent Appellants from referring to Appellee's "history of physical altercations" on the basis that the probative value of the challenged evidence, if any, was outweighed by the prejudicial effect it would have on the jury. Appellee's motion *in limine,* 11/16/00, at 4. Appellants contested the motion, arguing that their expert witness, Dr. Welch, was prepared to testify that the altercations affected Appellee's thoracic condition and contributed to the severe back pain that prompted Appellee to undergo spinal fusion surgery in the first place. Thus, Appellants requested that Dr. Welch be permitted to discuss the following events at trial:

(1) *A June 24, 1992 altercation* where [Appellee's] vehicle ran up an embankment and overturned. [Appellee] crawled out of the vehicle and assaulted a police officer by kicking the officer several times. According to [Appellee's] own testimony, he was kneed violently in the small of his back by the officer, placed in handcuffs, and lifted up by those handcuffs in such a manner as to cause excruciating back pain. He was also lifted off the ground and slammed to the trunk of his vehicle. The proffer also included evidence [Appellee] was treated at the emergency room following this altercation and that he returned to the hospital on June 25, 1992, with complaints of "worsening back pain." The medical records also stated: "IMPRESSION: Upper back pain and neck muscle spasms."

(2) *A May 1994 physical altercation* described in a medical record as a bar room fight which resulted in back pain to [Appellee].

(3) *An August 31, 1994 altercation* in which [Appellee] was "hit in the nose by several persons," causing swelling in his nose, pain in his left ear, and a fractured forearm.

(4) *A Summer 1995 fight* in a King's Restaurant parking lot wherein [Appellee] was attacked by two men. [Appellee] testified he was punched in the face and had his head smacked to the cement "two or three times."

Brief for St. Francis and Dr. Jacobson at 6 (citations to record omitted).

¶ 16 After reviewing Appellee's medical records, Dr. Welch compiled a report describing various injuries sustained by Appellee between 1983 and 1997. At the conclusion of that report, Dr. Welch stated as follows:

This is an extensive list of traumatic injuries which occurred prior to and following [Appellee's] 1990 surgery. One *cannot* ignore the potential and probable impact that these multiple altercations and traumatic events have had on his thoracic condition.

I am most concerned about the 1995 injury which he reports in his deposition. He was apparently beaten quite severely outside of a King's Restaurant. This is in addition to his multiple other traumatic events. Based on my review of these significant traumatic events, I do believe that they did contribute to his thoracic symptoms, including pain that he was experiencing following his 1990 surgery. The amount of force required to receive most of these traumatic events, especially the incident outside of King's Restaurant, was, in my opinion, significant and excessive, and in my opinion did contribute to his overall symptomatology.

Supplemental response to Appellee's motion *in limine*, 12/19/00, at 4–5.

¶ 17 The trial court observed that the proposed testimony was relevant insofar as it suggested a causal relationship between the altercations and the pain that Appellee suffered after the 1990 surgery but determined that the prejudicial impact of the testimony outweighed its probative value because Dr. Welch could not positively state that the injuries Appellee sustained in the altercations contributed to the abnormal curvature in his spine. Consequently, the court granted the motion *in limine*.

¶ 18 On December 8, 2000, the fourth day of trial, the parties revisited the admissibility of the altercation evidence after Appellee's aunt, Rose Bloser, described Appellee's physical capabilities and state of mind in the years following the 1990 surgery. On direct examination, Ms. Bloser testified that Appellee's spinal condition gradually deteriorated to the point where he "couldn't function" and that Appellee worried constantly about injuring his back when he learned about the unnecessary laminectomies. N.T. Trial, 12/8/00, at 713. When asked to describe Appellee's emo-

tional state during this period, Ms. Bloser stated in relevant part as follows:

Basically, his state of mind was that it was actually frightening because he thought, well, what would happen if I get hit in the back or what would happen-even just playing with his nieces and nephews, roughhousing, you know what I mean.

If he maybe went the wrong way, what was going to happen? There was always that fear.

. . . .

And it played havoc on his mind because he didn't socialize as much any more because he was afraid that if he would go somewhere, if somebody hit him or pushed him or shoved him, not knowing what would happen.

He was always afraid. That's the reason there were so many doctors because I would constantly tell him, you know, "You can't be too careful. You've got to keep close watch on your back."

N.T. Trial, 12/8/00, at 717–18.

¶ 19 At sidebar, Appellants argued that they were entitled to cross-examine Ms. Bloser regarding her knowledge of the altercations in order to discredit her claim that Appellee became withdrawn after the 1990 surgery because he was afraid to engage in physical activities that might aggravate his condition. Appellee countered that if the trial court permitted this line of questioning, Appellants would have to establish that Appellee did not act in self-defense, and the jury would be exposed to prejudicial evidence pertaining to collateral issues. In response, Appellants offered to present the testimony of the police officer who was involved in the June 23, 1992 altercation, but the trial court declined to reverse its prior ruling.

¶ 20 Presently, Appellants assert that the trial court abused its discretion in pre-

cluding them from inquiring as to Ms. Bloser's knowledge of the altercations after she testified on direct examination that Appellee's physical capabilities were severely limited following the 1990 operation and that Appellee was so concerned about injuring his back that he stopped "roughhousing" with his nieces and nephews. Appellants contend that Appellee opened the door for the introduction of the altercation evidence by making his state of mind an issue at trial and presenting testimony which indicated that Appellee worried about the unnecessary laminectomies so much that he avoided horseplay with children and fistfights with adults. Although the jury may have looked unfavorably upon Appellee after learning about the altercations, Appellants claim the trial court's ruling unfairly benefited Appellee because it prevented them from introducing rebuttal evidence that would have impeached Ms. Bloser's testimony. We agree.

¶ 21 The scope of cross-examination is within the sound discretion of the trial judge, and we will not reverse the judge's determination absent an abuse of that discretion. *Yacoub, supra; see also Majczyk v. Oesch,* 789 A.2d 717 (Pa.Super.2001) (trial judge has considerable latitude in determining scope of cross-examination; his determination will not be reversed absent an abuse of discretion unless complaining party suffered obvious disadvantage). Similarly, the admission or rejection of rebuttal evidence is within the sound discretion of the trial judge. *Mitchell v. Gravely International, Inc.,* 698 A.2d 618 (Pa.Super.1997).

¶ 22 During the December 8, 2000 sidebar discussion, the trial court admonished Appellee's counsel for allowing Ms. Bloser to give a "dissertation" on the topic of Appellee's mental state, yet it refused to permit Appellants to refer to the alterca-

tions on cross-examination, stating that Ms. Bloser's testimony on this issue "doesn't bind [Appellee]." N.T. Trial, 12/8/00, at 727–29. Thereafter, in its Pa. R.A.P.1925(a) opinion, the trial court explained that it prohibited the cross-examination because the altercation evidence was highly prejudicial. The court ultimately concluded that its ruling did not harm Appellants because Appellee admitted on cross-examination that he exercised with weightlifting machines on various occasions between 1995 and 1996, which demonstrated that Appellee engaged in strenuous physical activity after the 1990 surgery.

¶ 23 Based on our review of the record, we find that the trial court abused its discretion in prohibiting Appellants from referring to the altercations on cross-examination. Notwithstanding the prejudicial nature of the proposed inquiry, Appellants should have been permitted to pursue this line of questioning after Appellee presented testimony indicating that he was so concerned about the unnecessary laminectomies that he scrupulously avoided physical contact with others. Moreover, contrary to the trial court's position, Appellee's concession that he occasionally lifted weights in order to strengthen his back muscles did little to discredit Ms. Bloser's testimony. Although this evidence showed that Appellee was capable of physical exertion, it did not refute the assertion that Appellee worried incessantly about someone striking him or pushing him in an aggressive manner.

¶ 24 The trial court's ruling on the motion *in limine* benefited Appellee as it excluded tangentially relevant evidence which indicated that Appellee was prone to violent behavior. Appellee then introduced testimony which falsely implied that he constantly feared for his safety

after learning about the unnecessary laminectomies, thereby opening the door for Appellants to cross-examine Ms. Bloser regarding her knowledge of the altercations referenced in Dr. Welch's expert report. *See, e.g., Jamison v. Ardes,* 408 Pa. 188, 182 A.2d 497 (1962) (plaintiff in wrongful death action opened the door for the introduction of inadmissible evidence by introducing testimony which falsely implied that criminal charges had been brought against the defendant in connection with the accident upon which the action was based); *Collins v. Cement Express, Inc.,* 301 Pa.Super. 319, 447 A.2d 987 (1982) (since plaintiffs in personal injury action initially informed the jury that they applied for and received social security disability benefits, trial court properly permitted defendants to explore the subject on cross-examination).

¶ 25 In the instant case, Appellee presented himself as a meek individual who exercised extreme caution in caring for his back, and the jury awarded him over $500,000 for pain, suffering, and emotional distress. Since this inaccurate portrayal may have influenced the damage award, we find that a new trial is warranted. *Yacoub, supra; Detterline, supra.*

¶ 26 In a related claim, St. Francis and Dr. Jacobson assert that the trial court erroneously precluded them from introducing evidence of the altercations during their case-in-chief. Accordingly, we must determine whether the trial court erred in granting Appellee's motion *in limine.*

 ¶ 27 In reviewing a ruling on a motion *in limine,* we apply the scope of review appropriate to the particular evidentiary matter. *Rachlin v. Edmison,* 2002 PA Super 387, 813 A.2d 862. When a party challenges a ruling pertaining to the admissibility of evidence, we will not reverse the ruling unless the trial court abused its discretion or committed an error of law. *Id.*

 ¶ 28 In the case *sub judice,* the trial court reasoned that the proffered evidence was immaterial and inflammatory because Dr. Welch's report failed to establish a causal relationship between the altercations and Appellee's spinal deformity. In addition, the court stressed that the central issue in this case was whether Appellants' alleged negligence had caused Appellee to develop thoracic kyphosis and observed that evidence concerning Appellee's physical behavior after the 1990 surgery would not aid the jury in resolving that issue. Hence, the court granted the motion *in limine.*

¶ 29 Instantly, St. Francis and Dr. Jacobson assert that the trial court's reasoning was flawed because the primary issue at trial was whether the unnecessary laminectomies caused the pain and discomfort that prompted Appellee to undergo spinal fusion surgery in 1998, not whether Appellee developed kyphosis as a result of the 1990 operation. Consistent with this view, they claim that the trial court abused its discretion in granting the motion *in limine* since Dr. Welch's report established a nexus between the altercations and the pain that plagued Appellee after the 1990 surgery. Had they been permitted to discuss the altercations at trial, St. Francis and Dr. Jacobson contend that the jury may have reached a different verdict.

¶ 30 Upon review, we find that that the ruling in question did not constitute an abuse of discretion. Despite St. Francis's claim to the contrary, the fundamental issue at trial was whether the 1990 surgery caused the abnormal curvature in Appellee's spine, as demonstrated by the fact that Appellants disputed Appellee's contention that he developed kyphosis as a result of the unnecessary laminectomies. Therefore, since Appellants failed to show

that the altercations played any role in the progression of Appellee's spinal abnormality, the trial court reasonably determined that the prejudicial impact of the proposed evidence outweighed its probative value. Moreover, although Dr. Welch's report indicated that the 1995 altercation intensified the symptoms that prompted Appellee to undergo corrective surgery in 1998, the jury was informed that Appellee received medical treatment for back injuries after the automobile accident that preceded the 1992 altercation with the police officer, an automobile accident that occurred in 1996, a rear-end automobile collision that occurred 1997, and a slip-and-fall incident at a car dealership in 1997. On direct examination, Dr. Welch described the significance of these events and opined that they "unquestionably" contributed to the pain and suffering that Appellee endured between 1990 and 1998. N.T. Trial, 12/15/00, at 903. Thus, we reject the claim that the trial court's ruling on the motion in *limine* undermined Appellants' defense theory and affected the verdict.

¶ 31 St. Francis and Dr. Jacobson next contend that the trial court erred in precluding them from impeaching Dr. Shelokov's testimony with prior inconsistent statements contained in his expert report. This claim is premised on the fact that Dr. Shelokov's report indicated that Dr. Ferraro was partly responsible for Appellee's injuries. Since Dr. Shelokov did not say anything critical of Dr. Ferraro at trial, St. Francis and Dr. Jacobson argue that they should have been permitted to cross-examine Dr. Shelokov regarding the following passages contained in his report:

First, Dr. Ferraro failed to perform appropriate physical examination which must include inspection of the patient's skin. Second, he did not perform timely radiographic evaluation after he noted that the patient did have abnormalities on the neurologic exam. At that time, the spinal tumor would have been found, and the patient's impotence could have been largely avoided. Evaluation was not undertaken until a year-and-a-half later, at which time, the patient's symptoms had progressed dramatically. This delay in timely diagnosis caused objective injury to the patient.

. . . .

Finally, Dr. Ferraro is at fault for not obtaining immediate intraoperative radiographs to identify the location of the tumor when his first laminotomy [sic] did not identify the location of the tumor. As a consequence of this deviation, the patient had incapacitating back pain. Post-laminectomy kyphosis is a well-known complication which is taught in medical school and in orthopedic and neurological residency programs. The physician failed to recognize that and refer the patient for appropriate correction and management of the patient's kyphosis. This constituted unnecessary delay in diagnosis and significantly strays from the standard of care.

Brief of St. Francis and Dr. Jacobson at 23 (citation to record omitted).

¶ 32 The trial court did not err in prohibiting Appellants from questioning Dr. Shelokov about these passages. As noted, this Court affirmed the nonsuit granted with respect to the negligence claims asserted against Dr. Ferraro at Count II of Appellee's complaint; therefore, any portion of Dr. Shelokov's report relating to those claims was wholly irrelevant upon remand. Furthermore, St. Francis and Dr. Jacobson had Dr. Ferraro dismissed from the case over Appellee's objection based on assurances that they would not attempt to blame Dr. Ferraro for Appellee's injuries. Hence, the trial court correctly determined that any inquiry directed at Dr. Ferraro's failure to exercise due

care in diagnosing or removing the neuro-fibroma tumor would have been improper under the circumstances.

¶ 33 Finally, St. Francis and Dr. Jacobson contend that the trial court erroneously barred them from presenting evidence that Appellee received worker's compensation benefits from 1988 through 1997 for total and partial disability as a result of an unrelated neck injury that had occurred in September 1988. Specifically, they argue that evidence pertaining to Appellee's receipt of worker's compensation benefits following the 1988 injury was relevant to the measure of damages in this case and should have been admitted pursuant to this Court's decision in *Gigliotti v. Machuca*, 409 Pa.Super. 50, 597 A.2d 655 (1991). For the reasons that follow, we disagree.

¶ 34 The record reveals that Appellee filed a motion *in limine* seeking to prevent Appellants from introducing evidence that Appellee received worker's compensation benefits as a result of the 1988 neck injury and two subsequent work-related accidents. In support of the motion, Appellee asserted, *inter alia*, that the presentation of such evidence would violate the collateral source rule. In response, St. Francis and Dr. Jacobson claimed that the evidence was relevant to damages because it showed that Appellee was totally disabled from 1990 until 1997 as the result of a pre-existing injury. Following oral argument, the trial court granted the motion but stated that Appellants could inform the jury about the pre-existing neck injury and any post-operative back injuries that affected Appellee's thoracic region prior to the spinal fusion surgery performed by Dr. Shelokov.

¶ 35 St. Francis and Dr. Jacobson now claim that the trial court erred in granting the motion *in limine* with respect to the disability benefits received after the 1988

neck injury because the collateral source rule was inapplicable under the facts of this case. In addition, they posit that *"Gigliotti* highlights the relevance of this testimony, since evidence of [Appellee's] total disability and/or partial disability from an unrelated, pre-existing injury would tend to make less probable [Appellee's] claim that *all* of his damages were caused by the unnecessary T–5 and T–6 laminectomies during the 1990 surgery." Brief for St. Francis and Dr. Jacobson at 27. We will address these claims following a brief analysis of *Gigliotti.*

¶ 36 The plaintiff therein instituted an action seeking to recover damages for neck and back injuries that she allegedly sustained when the defendant's vehicle struck the rear of the car in which she was a passenger. At the pretrial conference, the plaintiff filed a motion *in limine* requesting, *inter alia*, that the defendant not be permitted to present any evidence concerning worker's compensation, medical, or wage loss benefits paid to the plaintiff as a result of a pre-existing neck injury that occurred fourteen months before the automobile accident. The trial court denied the motion and ruled that if the plaintiff attempted to introduce any medical bills incurred after the date of the automobile accident that had been paid by or submitted to the compensation carrier, the defendant would be given the opportunity to explore the plaintiff's receipt of those benefits. The case proceeded to trial, and the jury rendered a defense verdict. On appeal, we rejected the plaintiff's contention that the trial court's ruling on the motion *in limine* violated the collateral source rule, stating as follows:

> [T]his situation is distinguishable from the normal scenario in which collateral source issues arise. All of the cases cited by appellant involve situations wherein a plaintiff is injured in an acci-

dent, receives medical/or wage loss benefits for the injuries sustained as a result of **that** accident, and during the subsequent suit against the tortfeasor to recover for those same injuries, the tortfeasor attempts to introduce evidence of the payments from the collateral source. In those situations, the rationale behind the collateral source rule is that it would be unfair for the wrongdoer to receive the benefit of payments made by the collateral source. As stated by the Supreme Court in *Boudwin v. Yellow Cab Co.*, 410 Pa. 31, 33, 188 A.2d 259, 259 (1963), "[A] tortfeasor may not ride to immunity from his wrong on the back of worker's compensation paid by someone else." In the present situation, appellant had already suffered a prior accident and was already receiving worker's compensation benefits for **those** injuries when the accident giving rise to this litigation occurred. Thus, this was not a situation where [the defendant] was attempting to receive the benefit of the compensation payments for injuries he may have caused. The payment of the compensation benefits pre-dated the happening of the accident in this instance.

*Id.* at 661 (emphasis in original).

¶ 37 As St. Francis and Dr. Jacobson accurately note, the instant case, like *Gigliotti*, does not present a fact pattern that implicates the collateral source rule since the disability benefits in question were paid to Appellee as the result of an injury that pre-dated the incident that gave rise to this action. However, the record bears no indication that the trial court granted the motion *in limine* based on the collateral source rule; rather, the court granted the motion because Appellee did not request damages for lost wages during the period after the 1990 surgery when he had been receiving worker's compensation benefits related to the 1988 neck injury. *See*

Trial Court Opinion, 7/19/01, at 8–9; *see also* N.T. Trial, 12/7/00, at 648–50.

¶ 38 Similarly, we fail to see how *Gigliotti* "highlights" the relevance of the worker's compensation benefits at issue. That case simply reaffirmed the principle articulated in *Collins v. Cement Express, Inc.*, 301 Pa.Super. 319, 447 A.2d 987 (1982), wherein this Court held that the defendant in a personal injury action was entitled to explore the plaintiff's receipt of disability benefits at trial because the plaintiff broached the topic first. In the case at bar, Appellee did not seek reimbursement for any medical or wage loss benefits paid by his compensation carrier as a result of his pre-existing injury; accordingly, we affirm the trial court's determination that evidence concerning those benefits was irrelevant and inadmissible.

¶ 39 We now turn to Almar's remaining claims. Almar first contends that the trial court improperly allowed Dr. Shelokov to testify on re-direct examination that Dr. Alexander Kandabarow, a spinal deformity surgeon who examined Appellee in December 1994 and March 1995, studied x-rays of Appellee's thorax and like Dr. Shelokov, determined that Appellee suffered from thoracic kyphosis. Almar argues that since Dr. Shelokov did not rely on Dr. Kandabarow's notes in forming his opinion regarding Appellee's thoracic condition, Dr. Shelokov should not have been permitted to testify that Dr. Kandabarow, a nontestifying physician who had not been subjected to cross-examination, reached the same diagnosis as Dr. Shelokov. We agree.

¶ 40 In Pennsylvania, a medical expert is allowed to express an opinion that is based, in part, on medical records that have not been admitted into evidence if those records are customarily relied upon by experts in his profession. *Gunn*

*v. Grossman,* 748 A.2d 1235 (Pa.Super.2000). The applicability of this rule depends on the circumstances of each particular case and demands the exercise of the trial court's sound discretion. *Collins v. Cooper,* 746 A.2d 615 (Pa.Super.2000). "An 'expert' should not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment." *Primavera v. Celotex Corp.,* 415 Pa.Super. 41, 608 A.2d 515, 521 (1992).

¶ 41 In the instant case, Dr. Shelokov conceded on cross-examination that six doctors who examined Appellee between 1993 and 1997 did not diagnose him as having thoracic kyphosis. Thereafter, on re-direct examination, Appellee elicited the following testimony over Appellants' hearsay objection:

Q. [Appellee] was seen by another orthopedic surgeon; and you've seen his records, the records of Dr. Kandabarow, that I'll mark as Exhibit 157. Do you recall those?

A. Yes.

Q. And I want to bring this out for two reasons. First, what type of surgeon is Dr. Kandabarow, in looking at the face sheet?

A. He is the only other pediatric and adult spinal deformity surgeon that [Appellee] has ever seen.

Q. Now, when we talk about Dr. Kandabarow, there are two times he saw [Appellee]. He saw [Appellee] in December of 1994; and he saw him again in March of 1995, did he not?

A. He did.

Q. In December of 1994, did he take any films to see if [Appellee] had kyphosis in his first visit?

A. He did not.

Q. And so not having the benefit of any films in that first visit in December of 1994, what did he conclude about whether or not [Appellee] had kyphosis?

[DEFENSE COUNSEL]: Same objection, Your Honor.

THE COURT: I'm going to allow it. Overruled.

A. This note is an interesting note because it says two things to me. Under "Plan" I quote, "In addition, a standing lateral x-ray of the thoracolumbar spine will be obtained in the future to assess the degree of kyphosis in the thoracic region," which to me means that he perceived a thoracic kyphosis and wanted to get a numeric value.

. . . .

Q. Now, Doctor, he then got that x-ray, didn't he?

A. He did.

Q. Turn the page to his next visit in March of 1995. I had this blown up and marked as Plaintiff's Exhibit 158. Did he not state, "His standing lateral x-ray demonstrated a 60–degree kyphosis measuring from T–2 to T–12?"

A. He did.

Q. Is that consistent with what you found in 1995?

A. That is.

Q. He says, "I recommend observation of his thoracic kyphosis. If there is evidence of progression, which the likelihood is small, then posterior stabilization will be recommended." Is that consistent with your treatment plan?

A. It is exactly the treatment plan that you find in my office notes.

N.T. Trial, 12/6/00, at 350–53.

¶ 42 This Court repeatedly has held that an expert witness cannot bolster his credibility by reading into the record the report of a non-testifying expert who has not been subjected to cross-examination. *See, e.g., Oxford Presbyterian*

*Church v. Weil McLain Company, Inc.,* 815 A.2d 1094 (Pa.Super.2003) (expert cannot read opinions of non-testifying experts into record and say he agrees with them); *Allen v. Kaplan,* 439 Pa.Super. 263, 653 A.2d 1249 (1995) (new trial warranted where expert read into record report of non-testifying expert who had not been subjected to cross-examination); *Cooper v. Burns,* 376 Pa.Super. 276, 545 A.2d 935 (1988) (new trial ordered where trial court admitted testimony indicating that non-testifying physician reached same diagnosis as testifying physician). Therefore, since the record supports Almar's contention that Appellee elicited the challenged testimony for the sole purpose of bolstering Dr. Shelokov's credibility, we find that the trial court erred in admitting the testimony over Appellants' hearsay objection, and a new trial is warranted on this basis, as well. *Allen, supra; Cooper, supra.*

¶ 43 Lastly, Almar asserts that the trial court erred in permitting Appellee to cross-examine Almar's president, Dr. Stefano Bartoletti, regarding the bill Almar submitted to Appellee for Dr. Jacobson's services in marking Appellee's back prior to the 1990 surgery. Specifically, Almar claims that the court should have precluded Appellee from asking Dr. Bartoletti if Dr. David Lackner, an Almar radiologist who signed the bill, participated in the marking of Appellee's spine. Almar argues that this inquiry was irrelevant since Dr. Bartoletti already had conceded that another Almar employee, Dr. Scotti, signed the medical report that was produced shortly after Dr. Jacobson performed the marking procedure, which established that Dr. Jacobson had acted as an agent of Almar. Additionally, Almar asserts that this line of questioning was inflammatory because it falsely implied that Almar had billed Appellee for a procedure that was not performed by one of its employees. For reasons discussed *infra,* this claim is meritless.

¶ 44 In an effort to establish that Almar did not deviate from the standard of care, Dr. Bartoletti testified that second-year radiology residents generally do not require supervision when marking vertebrae levels because they become proficient with that procedure during their first year of residency. Thereafter, on cross-examination, Dr. Bartoletti maintained that Almar was not negligent for failing to supervise Dr. Jacobson because Almar would have provided a supervisor if Dr. Jacobson had indicated that he needed assistance in marking Appellee's spine. However, Dr. Bartoletti subsequently conceded that Almar was required to review all procedures performed by radiology residents, and Appellee inquired about the medical report and the billing statement to show that neither Dr. Scotti nor Dr. Lackner had supervised or reviewed the procedure performed by Dr. Jacobson. Moreover, by eliciting testimony which indicated that Almar, not St. Francis, billed Appellee for Dr. Jacobson's services, Appellee demonstrated that Dr. Jacobson performed the procedure on behalf of Almar and that Almar's involvement in this incident stretched beyond the production of the medical report. Thus, we find that the trial court did not abuse its discretion in permitting Appellee to question Dr. Bartoletti about the bill submitted by Almar for services rendered by Dr. Jacobson.

¶ 45 For all of the foregoing reasons, we reverse and remand for proceedings consistent with this opinion.[1]

¶ 46 Judgment reversed. Case remanded. Jurisdiction relinquished.

¶ 47 Judge MUSMANNO files a Dissenting Statement.

---

1. In light of our decision to grant a new trial, we do not address Appellee's claims challenging the trial court's calculation of delay damages.

174

MUSMANNO, J., Dissenting.

¶ 1 I respectfully dissent. The evidentiary rulings of the trial court cited by the majority, even if erroneous, were not so prejudicial as to warrant a new trial.