**SUBARU OF AMERICA, INC., Petitioner,**

v.

**STATE BOARD OF VEHICLE MANUFACTURERS, DEALERS AND SALESPERSONS, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2003.

Decided Feb. 19, 2004.

1004

James J. Kutz, Harrisburg, for petitioner.

Eric L. Chase, Mooristown, NJ, for respondent.

BEFORE: FRIEDMAN, Judge, and LEAVITT, Judge, and MIRARCHI, Senior Judge.

OPINION BY Judge LEAVITT.

Subaru of America, Inc. (Subaru) petitions for review of an adjudication of the State Board of Vehicle Manufacturers, Dealers and Salespersons (Board) that barred Subaru from terminating the franchise of Colonial Volkswagen–Subaru, Inc. (Colonial). We affirm the Board's decision, which was unanimous.

## BACKGROUND

Subaru is a licensed motor vehicle distributor in Pennsylvania, and Colonial is a licensed motor vehicle dealer located in Feasterville, Pennsylvania. In July 1998, Colonial purchased its Subaru franchise from Northeast Auto Imports, and on September 1, 1998, Colonial and Subaru entered into a Dealership Agreement (Agreement).[1] At the time the Agreement was executed, Colonial also held a franchise to sell Volkswagen vehicles. The Agreement is a standard form dealership contract with several addenda particular to the contrac-

---

1. The Agreement recites several dates for execution; however, it appears to have been effective as of September 1, 1998. Reproduced Record 34a (R.R. ——).

tual relationship between Subaru and Colonial; two addenda have relevance to this appeal.

The first is a Facility Addendum that permitted Colonial to begin operating as a Subaru franchisee without first meeting the Subaru Minimum Operational Standards. However, Colonial agreed to expand its showroom from 1800 square feet to 1920 square feet within 12 months of the effective date of the Agreement. Colonial further acknowledged that failure to meet this obligation would constitute a material breach of the Agreement.

The second is the Performance Addendum, which provided that "[d]uring the twelve (12) months after the effective date of the Agreement, Dealer will make every effort to sell 506 Subaru vehicles." R.R. 38a. This addendum also recites that Colonial's failure to sell the required number of Subaru vehicles would constitute a material breach of the Agreement.

During its first few months of operation, Colonial met Subaru's expectation with respect to vehicle sales. However, in the first quarter of 1999, Subaru sales began to decline, and this decline continued throughout the summer. Accordingly, by the end of its first year of operation, Colonial had sold 368 Subarus, short of the 506 vehicle quota. However, during this year, Subaru only made available to Colonial 481 vehicles. With respect to the Agreement's

Facility Addendum, Colonial took the steps necessary to expand the facility. The expansion required approval by Subaru, Volkswagen and the municipality before construction could begin.[2]

In a letter to Colonial dated December 6, 1999, Subaru presented Colonial with two options: "[c]ommit to our offer of relocating to Langhorne and providing an exclusive facility" or "execute the Buy/Sell with Fred Beans [another local car dealership], or execute a Buyers Assistance Letter to allow us to prospect for dealer candidates who will provide an exclusive facility in Langhorne." R.R. 152a. Subaru further stated that if Colonial refused either option, its franchise would be terminated for failure to fulfill the requirements of the Performance Addendum. Finally, Subaru advised Colonial not to proceed with the construction of the new showroom because it was merely "a 'band-aid' to the performance issues." R.R. 151a. Colonial was requested to respond by December 30, 1999.

By letter dated December 13, 1999, Colonial responded to the points made by Subaru in its December 6, 1999 letter,[3] but it did not commit to one of the options suggested by Subaru.[4] The parties continued discussions in an effort to resolve their differences, but on March 27, 2000, Subaru notified Colonial that unless the dealership moved to Langhorne, Subaru would termi-

2. By letter dated November 26, 1999, William S. Stamps (Stamps), who has an ownership interest in Colonial and serves as vice-president, informed Subaru that he had submitted an application for municipal approval of the new showroom. R.R. 145a. Colonial's other owners are Randy Lebowitz (Lebowitz), Ronald Schwartz (Schwartz), and Jeffrey D. Feldman (Feldman). Lebowitz is Colonial's Treasurer, Schwartz is Colonial's President, Executive Manager, and General Manager, and Feldman is Colonial's Secretary. R.R. 179a.

3. Specifically, Colonial noted that compliance with the sales quota was demanded at the "twelfth hour" of the transaction; that the target of 506 vehicles was unreasonable and far higher than the quota set for the prior dealer; and that Colonial had made every effort to fulfill the quota. R.R. 153a–155a.

4. Colonial considered the option of relocating the dealership and examined several properties with Subaru. The parties, however, could not agree on a new location.

nate the Agreement as of May 29, 2000. This deadline was extended to October 31, 2000. In the meantime, Colonial received approval for its new showroom and began construction in May 2000.

On November 6, 2000, Subaru issued to Colonial a "Notice of Intention to Terminate the Dealership Agreement." The stated basis of the termination decision was as follows:

> Material Breach of the Subaru Dealership Agreement. Dealer entered into Agreement with Distributor September 1, 1998 agreeing to sell a specified number of new Subaru vehicles during the twelve-(12) months following the effective date of the Agreement. During the period specified, the Dealer's actual Subaru Sales as reported in Subaru of America's sales reporting system represented 73% of the required sales as set forth in the Dealership Agreement and Performance Addendum to the Subaru Dealership Agreement.

R.R. 254a. In the meantime, Colonial had invested approximately $1.2 million to construct the new showroom.

On December 13, 2000, Colonial filed a protest with the Board, challenging Subaru's decision to terminate Colonial's franchise. The parties attempted mediation,[5] but it was unsuccessful. The Board then conducted several days of hearings on Colonial's protest.[6]

The Board sustained Colonial's protest, finding in relevant part as follows:

Because [Subaru] failed to provide sufficient inventory to permit [Colonial] to comply with the sales obligation of its franchise agreement, because [Subaru] attempted to coerce [Colonial] into relocating its franchise under threat of termination, because [Subaru] did not attempt to terminate the franchise until 14 months after the purported grounds for termination were established, and because [Subaru] permitted [Colonial] to continue to invest in renovating its showroom to meet Subaru Signature Status after grounds for termination were established but prior to issuing notice of termination, the Board concludes that [Subaru's] ... attempted termination of [Colonial's] franchise was unfair, without due regard to the equities of [Colonial], and without just cause.

Board Opinion, 7. Subaru then petitioned this Court for review.[7]

■ On appeal,[8] Subaru raises several issues. It first contends that it was deprived of a fair hearing because the Board refused to grant Subaru's motion to recuse the three new vehicle dealers on the Board from participating in the hearing. Second, the Board improperly denied Subaru's prehearing and evidentiary motions, which prevented Subaru from proving that it had just cause to terminate Colonial's franchise. Third, Subaru contends that the evidence does not support the Board's conclusion that Subaru's termination was

---

**5.** Section 11 of the Board of Vehicles Act (Act), Act of December 22, 1983, P.L. 306, *as amended,* 63 P.S. § 818.11, requires licensees to engage in mediation prior to filing a protest.

**6.** The Board held hearings on May 13–15, 2002 and June 24–26, 2002.

**7.** On November 26, 2002, Colonial intervened.

**8.** Our review of the Board's order is limited to a determination of whether the constitutional rights of the licensee were violated, whether the order is in accordance with existing law, or whether any necessary findings of fact are not supported by substantial evidence. *Storch v. State Board of Vehicle Manufacturers, Dealers and Salespersons,* 751 A.2d 263 (Pa.Cmwlth.2000); Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

without just cause, unfair and without regard to the equities. We address these arguments *seriatim.*

## BIAS OF TRIBUNAL

■ Subaru moved to recuse three of the 17 members of the Board to prevent their participation in this adjudication. Those three individuals were the new vehicle dealers on the Board.[9] Subaru contends that all new vehicle dealers are biased against manufacturers and, therefore, their presence on the Board deprived Subaru of a fair hearing. In effect, Subaru challenges those provisions of the Act that place responsibility for adjudicating franchise disputes into the hands of various types of vehicle dealers as well as "four

... members of the general public having no connection with the vehicle business," 63 P.S. § 818.3(a)(7). Subaru contends that this composition of the Board is inherently flawed because automobile manufacturers are not represented.

■ The question is whether we can find, as a matter of law, that the three new vehicle dealers on the Board should have been disqualified for bias. There are different kinds of "bias" and not all kinds require the disqualification of an adjudicator. As has been explained by Professor Kenneth Culp Davis,

> *Bias in the sense of preconceived views about law or policy is not a disqualification*[10] and ordinarily prejudgment of

---

9. Section 3(a)(7) of the Act provides for the composition of the Board. It states:

(a) **Board.**—The State Board of Vehicle Manufacturers, Dealers and Salespersons shall consist of 17 members, one of whom shall be the Commissioner of Professional and Occupational Affairs, or his designee, one of whom shall be the Secretary of the Department of Transportation, or his designee, one of whom shall be the Director of Consumer Protection in the Office of Attorney General, or his designee, and the remaining 14 of whom shall be appointed by the Governor as follows:

(1) *Three* members shall be *new vehicle dealers* who have been actively engaged as such for a period of five years immediately preceding their appointment.

(2) *Three* members shall be *used vehicle dealers* who have been actively engaged as such for a period of five years immediately preceding their appointment. One used vehicle dealer member beginning with the first vacancy for a used vehicle dealer after the effective date of this amendment shall also be an owner, partner or officer of a corporation or business which is licensed as a vehicle auction and which has been actively engaged as such for a period of five years immediately preceding the appointment.

(3) *One* shall be a manufactured housing or *mobile home dealer* who has been

actively engaged as such for a period of five years immediately preceding appointment.

(4) *One* shall be a *salesperson* who has been actively engaged in the sale of new or used vehicles for a period of five years immediately preceding appointment. The member shall not be a dealer or an officer of a corporation or a member of a partnership engaged in the business of a dealer at the time of appointment.

(5) *One* shall be a *recreational vehicle dealer* who has been actively engaged as such for a period of five years immediately preceding appointment.

(6) *One* shall be a *motorcycle dealer* who has been actively engaged as such for a period of five years immediately preceding appointment.

(7) *Four shall be members of the general public* having no connection with the vehicle business.

63 P.S. 818.3(a) (emphasis added).

10. For example, a Federal Trade Commissioner should not be neutral on monopolies, and a Securities Exchange Commissioner should not be apathetic about 10–K filings.

Administrators who are unsympathetic toward the legislative program are very likely to thwart the democratic will; the way to translate legislative policies into action is to secure administrators whose honest opin-

legislative facts is not. Prejudgment of adjudicative facts may be, but probably not when the facts have been learned by an officer in his judicial capacity. Personal prejudice—an attitude of favoritism or animosity toward a particular party—disqualifies when it is substantial. Uniform rulings favoring one side do not alone prove disqualification.

Kenneth Culp Davis, Administrative Law Text, *Bias* § 12.06, at 253 (3d Ed.1972) (Davis) (emphasis added). A direct pecuniary interest or some other tangible stake in the outcome of a case is a type of bias that requires disqualification. Charles H. Koch, Jr., Administrative Law And Practice, *Bias and Prejudgment*, § 6.10, at 300 (2d Ed.1997). Speculative gain or loss is not enough to show that an adjudicator has an improper interest in the outcome of a case. *Air Line Pilots Association International v. U.S. Department of Transportation*, 899 F.2d 1230, 1232 (D.C.Cir.1990). In rare cases, extreme conduct by an adjudicator will demonstrate disqualifying bias that will violate due process. *Gimbel v. Commodity Futures Trading Commission*, 872 F.2d 196, 198 (7th Cir.1989).

Here, Subaru claims that placing new vehicle dealers on the Board without manufacturer representation created such an appearance of partiality as to violate due process. Notably, Subaru does not assert that any of these three Board members, *as individuals*, demonstrated a particular *animus* toward Subaru, conducted the hearing unfairly, or had any tangible, direct pecuniary interest in the outcome of the hearing. Rather, Subaru believes that dis-

qualifying bias can be inferred from their status as dealers.

In support of its position, Subaru directs our attention to *American Motors Sales Corp. v. New Motor Vehicle Board*, 69 Cal.App.3d 983, 138 Cal.Rptr. 594 (1977). In that case, the California Court of Appeals considered whether a board established to consider, *inter alia*, dealer terminations was properly constituted where four of the nine board members were new vehicle dealers. The Court held that the board's composition violated due process because the new dealer members had "an economic stake in every franchise termination case that comes before them." *Id.* at 596. Further, the fact that the Board had five other members that were not new vehicle dealers did not cure the problem for the Court of Appeals because none of those five Board members were new vehicle manufacturers.[11]

There are several flaws in this holding that were aptly identified by the dissent in *American Motors*. First, the majority relied upon *Tumey v. State of Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) for its conclusion that new vehicle dealers have a substantial stake in the outcome of "every" termination case. In *Tumey*, an Ohio town mayor adjudicated alleged violations of the state liquor law; his entire compensation for this work was derived from the fines paid by those found guilty. This factual construct bears little resemblance to that in *American Motors;* the California statute did not require the dealers on the board to find against manufacturers in order to be compensated. Indeed, the pecuniary interest of the dealers

---

ions—biases—are favorable to those policies.
Davis, *Bias* § 12.01, at 247.

**11.** By contrast, the Pennsylvania Board has 17 members. The number of public members exceed the number of any type of vehicle

dealer. In addition, three public officials serve on the Board. 63 P.S. § 818.3(a)(7). The General Assembly has gone to great lengths to establish a body that conveys an appearance of impartiality, not the reverse, as contended by Subaru.

in the outcome of a case, which was alluded to by the *American Motors* majority, was not direct but attenuated. As noted by the dissent,

> It is sheer speculation to conclude, absent a finding of actual bias, that a dealer-member has a pecuniary interest antagonistic to the manufacturer in disputes between dealer and manufacturer.

*American Motors*, 138 Cal.Rptr. at 600 (Regan, J., dissenting). Second, the majority failed to account for refinement in the law of bias that developed after *Tumey*. In *Hortonville Joint School District No. 1 v. Hortonville Education Association*, 426 U.S. 482, 491, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976), for example, the U.S. Supreme Court held that disqualifying bias cannot be applied from one case to another because each individual adjudicator will have a different interest at stake, depending on the nature of the controversy. Thus, it was simply error for the *American Motors* majority to reach the conclusion, without any evidence, that every new dealer would be antagonistic to every manufacturer in every case. Finally, as noted by the dissenting justice in *American Motors*, the California legislature had not placed manufacturers on the board because of anti-trust concerns.

■ To show impermissible bias, the interest of the adjudicator in the outcome of the case must be direct, and it must be substantial. *Withrow v. Larkin*, 421 U.S. 35, 46–47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).[12] *Rite Aid Corp. v. Board of Phar-*

*macy of State of New Jersey*, 421 F.Supp. 1161 (D.N.J.1976), offers a persuasive analysis on the issue of when the interest of a board member will be found impermissible.[13] In *Rite Aid*, the court considered Rite Aid's facial challenge to a board of individual pharmacists, who were asserted to be inherently biased against chain stores.[14] The court held that such pharmacists could not be found universally to have a substantial pecuniary interest in the outcome; rather, Rite Aid was required to produce actual evidence of bias in order to disqualify an individual pharmacist. We agree with this approach. Impermissible bias requires evidence particular to the adjudicator and particular to the controversy; disqualifying bias cannot simply be inferred from the status of the adjudicator, particularly where that status is required by statute.[15]

■ Subaru's real problem is with the decision of the General Assembly to place persons on the Board with a knowledge of the business and, presumably, a commitment to the policy expressed in the Act. However, preconceived views about law or policy are not a basis for disqualification. Davis, *Bias* § 12.06, at 253. A tribunal, to be fair, is not required to be staffed by indifferent citizens with at most a tepid enthusiasm for the agency's statutory mission. It has been understood from the early days of administrative law that

> Cabinet officers charged by Congress with adjudicatory functions are not as-

---

**12.** The majority in *American Motors* made no attempt to identify the individual interests of the new vehicle dealers; it simply inferred such interest, holding that all new vehicle dealers had a stake in the outcome of a dealer and manufacturer dispute.

**13.** Indeed, the *American Motors* dissent quotes nearly the full text of the *Rite Aid* decision.

**14.** The Board of Pharmacy of the State of New Jersey was composed of five registered pharmacists, one lay member of the public, and one lay state executive official. *Rite Aid*, 421 F.Supp. at 1163.

**15.** Subaru, in effect, invites us to nullify legislation that is to be presumed constitutional. *Commonwealth v. Means*, 565 Pa. 309, 315, 773 A.2d 143, 147 (2001).

sumed to be flabby creatures any more than judges are. Both may have an underlying philosophy in approaching a specific case. But both are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances. Nothing in this record disturbs such an assumption.

*U.S. v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).[16] The same must be said here: nothing in this record "disturbs [the] assumption" that the new vehicle dealers on the Board acted in good conscience and with intellectual discipline in judging the controversy before them.

We hold, therefore, that the Board properly refused to disqualify the new vehicle dealers from hearing the controversy between Subaru and Colonial.[17]

## PRE–HEARING AND EVIDENTIARY MOTIONS

Subaru next contends that the Board improperly denied several of Subaru's pre-hearing and evidentiary motions. Specifically, Subaru contends that the Board erred by (1) limiting the documents to be produced by Colonial at the hearing; (2) allowing Colonial's experts to testify; and (3) disallowing Subaru's cross-examination of Colonial about a 1997 financial record. For the reasons explained as follows, we uphold the Board's determinations.

■ Before the hearing, Subaru requested the Board to issue a subpoena *duces tecum* to the three principals of Colonial, requiring them to appear at the hearing and to bring with them certain documents. Those documents included: any communications between Subaru and Colonial; communications with Northeast Auto prior to September 1, 1998; documents related to Colonial's sale of Volkswagen vehicles; and Colonial's files on the sale of Subaru vehicles. The Board issued the requested subpoenas but limited the documents to be produced to "copies of all non-privileged statements made by you concerning the formation and termination of the Subaru franchise of Colonial...." R.R. 1056a–1058a.

■ The General Rules of Administrative Practice and Procedure, 1 Pa.Code § 35.142, authorize the Board to issue a subpoena for evidence that is relevant and material to the proceeding.[18] It is within

---

16. This controversy enjoyed numerous peregrinations to the U.S. Supreme Court. The holding cited above is popularly known as the *"Fourth Morgan"* case.

17. In addition, Subaru filed a Motion to Present Panel with Recent Judicial Decision, pursuant to Pa. R.A.P. 2501(a), and attached a copy of *General Motors Corporation v. Stan Olsen Pontiac GMC–Trucks, Inc. of Omaha, Nebraska,* No. CI 03–2208 (Lancaster Co., Neb. filed December 9, 2003). In that case, the District Court of Lancaster County, Nebraska noted that the Nebraska Motor Vehicle Industry Licensing Board cannot be deemed an impartial fact-finding body since seven of its ten members are vehicle dealers. We find this decision to be unpersuasive for the same reasons discussed herein with respect to *American Motors.*

18. The regulation provides that:
 (a) *Issuance.* Subpoenas for the attendance of witnesses or for the production of documentary evidence, unless directed by the agency upon its own motion, will issue only upon application in writing to the agency head or the presiding officer, except that during sessions of a hearing in a proceeding, such application may be made orally on the record before the agency head or presiding officer, *who is hereby given authority to determine the relevancy and materiality of the evidence sought and to issue such subpoenas in accordance with such determination.* Such *written applications shall specify as nearly as may be the general relevance, materiality, and scope of the testimony or documentary evidence sought,* including as to documentary evidence, specification as nearly as may be, of

the Board's discretion whether to require the production of any documents, and if it does so order their production, to limit them. *Walker Pontiac, Inc. v. Department of State, Bureau of Professional and Occupational Affairs*, 136 Pa.Cmwlth. 54, 582 A.2d 410, 413 (1990). This Court will not reverse an agency's decision to limit document production except for abuse of discretion, which is demonstrated where the limitation is manifestly unreasonable or shows partiality, prejudice, bias or ill will toward a litigant. *Denbow v. Borough of Leetsdale*, 699 A.2d 838, 840 n. 3 (Pa. Cmwlth.1997). Here, the Board limited the documents to those relevant to "formation and termination of the Subaru franchise of Colonial." This relevancy and materiality limitation was not very limiting, is unassailable, and left a large volume of documents to be produced. The Board's decision not to give Subaru everything it wanted falls far short of abuse of discretion.

██ Also before the hearing, Subaru filed a motion *in limine* to exclude the testimony and report of Colonial's expert, Ernest H. Manuel, Ph.D. The motion was denied, and Dr. Manuel testified that Subaru's sales quota of 506 vehicles was unreasonably high. Subaru contends that Dr. Manuel did not render an expert opinion, but, rather a personal opinion, and, therefore, his report and testimony should have been excluded.

██ Pennsylvania Rule of Evidence 702, although not applicable to administrative proceedings, provides guidance. Rule 702 directs that an expert may express an opinion in the following circumstances:

> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Pa. R.E. 702. As is the case for most evidentiary rulings, the admission of expert testimony will not be reversed except for abuse of discretion. *Nixon Hotel, Inc. v. Redevelopment Authority of City of Butler*, 11 Pa.Cmwlth. 519, 315 A.2d 366, 370 (1974). *See also Bob Wark's Arco, Inc. v. Department of Transportation Bureau of Traffic Safety*, 71 Pa.Cmwlth. 644, 455 A.2d 770, 772 (1983) (stating that discretion is abused where evidence proper and essential to a party's case is not admitted).

██ Pursuant to Section 505 of the Administrative Agency Law, 2 Pa.C.S. § 505,[19] the Board, as a Commonwealth agency, is not bound by the technical rules of evidence. Accordingly, in determining whether Dr. Manuel's expert report expressed knowledge beyond that of a lay person and was helpful to the Board's fact finding, the Board enjoyed more discretion than would a court of law bound by technical rules of evidence. Subaru cannot cite precedent or give a cogent reason why the Board should have excluded Dr. Manuel's testimony, let alone how this decision demonstrates an abuse of discretion. In any

---

the documents desired and the facts to be proved by them in sufficient detail to indicate the materiality and relevance of such documents.

1 Pa.Code § 35.142(a) (emphasis added).

**19.** It states:

Commonwealth agencies shall not be bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be received. Reasonable examination and cross-examination shall be permitted.

2 Pa.C.S. § 505.

case, it is of no moment because the Board appeared to assign little weight to Dr. Manuel's opinion. Indeed, the Board rejected Dr. Manuel's opinion [20] that Subaru's sales quota was unreasonably high. Board Opinion, 5 n. 4.[21] The Board did not abuse its discretion in denying Subaru's motion *in limine*.

■ Lastly, Subaru contends that the Board improperly disallowed Subaru from cross-examining Colonial principal William Stamps regarding financial records that would have showed Colonial earned a "higher profit per sale of a Volkswagen than it did for a sale of a Subaru." Subaru Brief at 39. Subaru believed that these financial records, of which Stamps was presumed to be knowledgeable, would have shown that Colonial's focus was on the sale of Volkswagens, not Subarus, and that this was the true reason Colonial could not meet its Subaru sales quota.

■ *Reasonable* examination and cross-examination is permitted in administrative hearings. 2 Pa.C.S. § 505 (emphasis added). The scope of cross-examination allowed by an adjudicator should not be set aside absent an abuse of discretion. *Cacurak v. St. Francis Medical Center,* 823 A.2d 159, 167 (Pa.Super.2003).

The Board refused to allow Subaru to cross-examine Stamps about a 1997 financial statement of Northeast Auto Imports showing its results prior to Colonial's purchase of the franchise. The Board held that a predecessor's profitability was simply not relevant. It rejected the notion that the numbers in the financial statement "*by themselves* show that Colonial later did not exert appropriate efforts for Subaru." R.R. 2489a (emphasis added). Further, the Board expressed concern about "putting into the public record the financial records of someone who's not a party in this case." R.R. 2482a.[22] Nevertheless, the Board allowed Subaru to ask Stamps whether he reviewed the 1997 statement. When Stamps testified that he had not reviewed it, further questioning on the statement was disallowed for the above recited reasons.

Far from showing abuse of discretion, the Board's rulings demonstrate care and patience; they show that Subaru was given wide latitude to make its case. However, even if we disagreed with specific rulings, we may not substitute our judgment for that of the Board. *Commonwealth v. Hanible,* 575 Pa. 255, 259–60, 836 A.2d 36, 39 (2003).

---

**20.** Dr. Manuel also testified that Subaru terminated Colonial's franchise because it would not move to Langhorne. The Board found that this was the reason for Subaru's termination decision, and the record is replete with substantial evidence to support this finding. For example, Stamps testified that Subaru told him on several occasions that if he did not move the dealership, the franchise would be terminated. R.R. 2356a, 2364a.

**21.** Subaru also contends that the Board erred by failing to grant its application for a subpoena *duces tecum* to compel Dr. Manuel to produce any documentation that formed the basis of his expert report. Subaru alleges that the Board's decision not to grant its document requests prohibited Subaru from

cross-examining Dr. Manuel on the information that provided the foundation for his report. However, Dr. Manuel's testimony and report were admitted into evidence and Subaru had the opportunity to, and did, cross-examine Dr. Manuel. R.R. 2131a–2140a, 2197a–2256a, 2262a–2265a. Finally, this argument is without merit because the Board did not rely on Dr. Manuel's report when making its decision.

**22.** The Board explained that it would allow the financial statement into evidence if Subaru produced evidence later in the proceeding showing that the statement should be considered. R.R. 2488a–2489a. It never did, at least to the Board's satisfaction.

## APPLICATION OF SECTION 13(a) OF THE ACT

 Lastly, Subaru contends that the evidence does not support the Board's conclusion that the termination of Colonial's franchise was "unfair, without due regard to the equities of Colonial and without just cause," in violation of Section 13(a) of the Act.[23] Subaru does not challenge specific factual findings of the Board. Subaru's claim is that, even accepting the Board's factual findings, they are not adequate to support the Board's legal conclusions.

 In order for Subaru's termination to survive Colonial's protest, Subaru first had the burden under Section 13(e) of the Act[24] to prove that it had just cause for this action. A dealer's material breach of contract will serve as just cause; however, the manufacturer must give the dealer written notice of the breach in time for the dealer to remedy the breach. Section 2 of the Act provides, *inter alia,* that just cause is

[a] *material breach by a vehicle dealer* ... due to matters within the dealer's ... control, of a reasonable and necessary provision of an agreement *if the breach is not cured within a reasonable time after written notice of the breach has been received* from the ... distributor.

63 P.S. § 818.2 (emphasis added). Further, to base a termination on breach of contract, the manufacturer must show that its actions did not contribute significantly to the dealer's breach. 63 P.S. § 818.13(a).

In this case, Colonial was unable to meet the sales quota in the Performance Addendum because Subaru did not provide Colonial with sufficient inventory. Between September 1, 1998 and August 31, 1999, Subaru allocated 366 vehicles[25] to Colonial

23. It states:

(a) **Terminations.**—*It shall be a violation of this act for any manufacturer* or distributor, officer, agent or any representative whatsoever to *unfairly, without due regard to the equities of said dealer and without just cause, terminate* or fail to renew the franchise of any vehicle dealer; or being a manufacturer, to unfairly, without due regard to the equities of a distributor and without just cause, terminate or fail to renew the franchise of any distributor. *The manufacturer or distributor shall not meet its burden of proof to terminate* or fail to renew the franchise *if the acts of the manufacturer or distributor, in whole or in significant part, caused the dealer or distributor to be unable to comply substantially with the* reasonable and material requirements of the franchise.
63 P.S. 818.13(a) (emphasis added). The Court believes that a franchise termination that violates any one of these standards cannot be sustained. As a practical matter, just cause is the key inquiry in determining whether a termination can be sustained. A termination that lacks just cause cannot, at the same time, be fair or done with regard to

the equities. Thus, it was not necessary for the Board to find a separate factual scenario to attach to each separate statutory prohibition. The same conduct may violate all three statutory prohibitions. Further, a violation of one of the three prohibited actions will bar a franchise termination under Section 13(a) of the Act.

24. Section 13(e) states:

(e) **Burden of proof and just cause terminations on appeal.**—In the event of a dealer or distributor appeal of the termination or failure to renew of its franchise, the burden of proof shall be on the manufacturer or distributor to show that such termination or failure to renew was for just cause. Any termination or failure to renew which is subject to section 14 shall not be subject to this subsection.
63 P.S. § 818.13(e) (footnote omitted).

25. The Board found that Subaru allocated 481 vehicles to Colonial from September 1998 through August 1999. Finding of Fact No. 8 (F.F. —). This finding is not supported by the record because it appears that the Board added the number of vehicles allocated to Colo-

while demanding that it sell 506 vehicles. Nevertheless, Colonial sold 368 vehicles during that time period. Ex. Subaru 35.[26]

Subaru contends that Colonial should have requested additional cars if its inventory was inadequate to meet its sales quota. However, the record shows that Subaru could not give Colonial the necessary inventory due to Subaru's turn and earn system of car allocation.[27] For example, during the 1998–1999 sales year the Forester model was preferred by Subaru's customers. Although Colonial requested additional Foresters, Subaru would not allocate enough to meet Colonial's demand. If Subaru had allocated twenty more Foresters per month, Colonial would have easily exceeded the sales requirement. The record also shows that Subaru did not allocate to Colonial a good color mix of vehicles.[28]

Subaru tried to overcome these objective facts, insisting that the difficulty was not lack of inventory, but lack of commitment, and that Colonial focused on selling

Volkswagens rather than Subarus. However, this theory is not supported by the record. Stamps testified that because "it was easy to sell Volkswagens, we tried and put most of our effort" into improving Subaru sales. R.R. 2497a. He noted that more than half of Colonial's income came from selling and servicing Subaru vehicles. Further, Colonial responded to Subaru's suggestions to improve sales by appointing a sales manager dedicated to Subaru sales, by developing a Subaru-trained sales staff, by increasing its Subaru advertising budget, and by placing the Subaru inventory in the front of Colonial's sales area.[29] Stamps testified,

> We tried very hard. I put a tremendous amount of effort into this facility. I worked harder to sell Subaru than anything I've done in the last ten years. And because [Subaru] didn't give us inventory to sell, is, I believe, the reason why we're here today. [Subaru] didn't act in good faith. [Subaru] didn't live up to the commitments of [its] people. We

nial from August 1998 through October 1999 to reach its finding of 481, rather than adding the number of vehicles allocated from August 1998 through August 1999. *See* R.R. 616a. This error does not change the Board's legal conclusion that Subaru did not allocate sufficient vehicles to Colonial.

**26.** The Board initially sustained Colonial's Objection to Subaru's Exhibit 35 but later admitted the exhibit. R.R. 1666a, 1995a.

**27.** In the turn and earn system, the district sales manager obtains an allocation from the region. He then allocates a number of vehicles to each dealer within the district based on a dealer's percentage of sales versus the district's sales. Here, Stamps testified that manufacturers, other than Subaru, provide considerable assistance in allocating vehicles to new dealers. For example, Volkswagen allowed Colonial, as a new dealer, to "open order" vehicles which enabled Colonial to obtain more than its share of popular Volkswagen models.

Subaru argued that it did not cause Colonial to fail to meet its sales obligations because Subaru provided more inventory than Colonial was entitled to receive based upon Subaru's turn and earn system of allocations. The Board rejected this argument because it was based on a sales history established by Northeast Auto Imports, which sold significantly less vehicles than Colonial. Board Opinion at 6 n. 6. This conclusion is supported by the record. *See* Ex. Colonial 100 (noting that Northeast Auto Imports sold 398 vehicles in 1993, 280 vehicles in 1994, 201 vehicles in 1995, 301 vehicles in 1996, 384 vehicles in 1997 and 171 vehicles in 1998). Stamps also testified that there was no way he could get ahead in terms of sales given the restrictions built into Subaru's vehicle distribution system and the fact that he started with a poor inventory, which was not the case with Volkswagen or other dealerships that he did business with in the past.

**28.** *See* R.R. 2337a, 2352a.

**29.** *See* R.R. 2374a–2375a, 2498a.

at Colonial lived up to everything we could possibly do with the restraints put on us. . . . R.R. 2498a–2499a. Even Subaru's witness David D. Seator, Subaru's Regional Business Manager for Pennsylvania and New Jersey, admitted that he did not have any evidence to support the conclusion that Colonial salespersons steered customers to Volkswagens.[30] Subaru failed to prove that lack of commitment, not lack of inventory, caused Colonial to miss the sales quota in the Performance Addendum.

Further, as noted, a manufacturer cannot rely on breach of a franchise agreement as just cause to terminate the agreement unless the manufacturer has given the dealer written notice to that effect. That notice must be timely given in order to allow the dealer an opportunity to cure the breach. 63 P.S. §§ 818.2, 818.13(a). Here, Subaru did not notify Colonial in writing of its intention to terminate for lack of meeting the sales quota in the Performance Addendum until 14 months

*after* Colonial had missed the target. At that point, the breach was impossible to cure.

In sum, Subaru failed to provide Colonial with sufficient inventory, thereby contributing significantly to Colonial's inability to meet the sales quota in the Performance Addendum. Further, Subaru did not give written notice of the breach to Colonial in time to allow Colonial to remedy the problem. These facts prevented the Board from reaching any conclusion but that Subaru lacked just cause to terminate Colonial's franchise.

■ In addition, a franchise termination will not be allowed where it is unfair or effected without "due regard to the equities of [the] dealer." 63 P.S. § 818.13(a).[31] In concluding that Subaru's termination of Colonial also violated these standards, the Board considered two key factual matters.

■ First, Subaru permitted [32] Colonial to renovate its showroom to meet

---

30. At the time, Volkswagen sales generally exceeded Subaru sales, a market condition that was not within Colonial's control. Seator testified that Volkswagen was becoming popular due to the vehicle offers made by Volkswagen rather than the sales tactics of the Colonial salespersons. He testified, "Volkswagen Jetta . . . was starting to be a very hot product at the end of 1998. Beginning of January into February 1999 . . . Volkswagen had come out with a[$]199 a month lease with very little money down. It was pretty much a slam dunk, and there was a lot of excitement about that." R.R. 1958a. He also noted that a Colonial salesperson expressed concern because Subaru was not making offers as good as Volkswagen and they wanted to make money on Subarus. This testimony is supported by the fact that, nationally, Volkswagen was surpassing Subaru in terms of sales. From 1998 to 1999, Subaru sales increased 6.1% whereas Volkswagen sales increased 43.6%.

Although Seator testified that D.J., a salesperson for Colonial, informed him that he began pushing Volkswagens because he could

not make any money on Subarus, there is no evidence to suggest that the Colonial sales force, as a whole, had agreed to push Volkswagens over Subarus. The evidence merely indicates that Volkswagen was making better offers to Volkswagen customers that in turn benefited the salespersons.

31. Section 2 of the Act defines "due regard to the equities" as, "[t]reatment in enforcing an agreement that is fair and equitable to a dealer . . . and that is not discriminatory compared to similarly situated dealers. . . ." 63 P.S. § 818.2.

32. Subaru also contends that the Board erred by considering Colonial's conduct after issuance of the termination notice. Specifically, "the Board permitted Colonial to provide testimony concerning monies spent by Colonial, post-November 6, 2000, to construct a new Subaru showroom." Subaru Brief at 36 (footnote omitted). Allowing Colonial to present this evidence prejudiced Subaru because it formed the basis for sustaining Colo-

Subaru's standards before sending its termination notice to Colonial. Subaru criticized the construction of the showroom as "a 'band-aid' to the performance issues" and suggested that Colonial not proceed with construction. However, Subaru was aware that Colonial had undertaken the renovation to meet the terms of the Facility Addendum.[33] Further, Subaru approved Colonial's facility renovation and participated in its development.[34] The Board found this treatment to be without due regard to the equities, and we agree.

Second, Subaru threatened Colonial with termination if it did not relocate the facility. As early as July 1999, Subaru raised the issue of Colonial's relocation. As the year progressed, Subaru became increasingly aggressive on this point. Eventually, Subaru was quite clear: Colonial had to move to Langhorne, sell to someone who would locate there, or face termination.[35] As noted by the Board, a manufacturer may not coerce a dealer to its prejudice by threatening it with termination under Section 12(a)(4) of the Act.[36] If an action violates the statutory prohibition against coercive acts, a fortiori it is an unfair action, in violation of Section 13(a) of the Act.

We hold that the Board properly applied the terms of Section 13(a) of the Act to the facts developed at the hearing.[37] Under the Act, Subaru could not rely on Colonial's breach of the Performance Addendum to justify its termination because Subaru contributed to Colonial's inability to perform and did not give Colonial an opportunity to remedy the breach. Subaru allowed Colonial to invest in a new showroom while, at the same time, it attempted to force Colonial to move; these actions of

---

nial's protest. However, it is well settled that questions concerning the admission or exclusion of evidence are matters within the lower tribunal's discretion and will not be disturbed absent an abuse of discretion. *Milan v. Department of Transportation*, 153 Pa.Cmwlth. 276, 620 A.2d 721, 724 (1993).

33. Stamps questioned Subaru about whether Colonial was still a part of the Subaru Signature Facilities Program but never received a direct answer. Thus, Colonial built the showroom in accordance with the Facility Addendum. As late as a few months before the hearing before the Board, Colonial representatives questioned Subaru about the design of the showroom; in response, Subaru instructed them to follow Subaru's design brochure. R.R. 2344a–2345a.

34. Colonial committed to building the showroom in November 1998, two months after it entered into the Agreement, and Colonial had completed construction of the showroom at the time of the hearing. Although Subaru asked Colonial not to proceed with the showroom in December 1999, the Board found Colonial's evidence that Subaru continued to participate in the design of the showroom to be credible and relevant to determining whether Subaru acted fairly toward Colonial.

35. Subaru attempted to have Colonial sign an addendum to the Agreement wherein Colonial would agree to relocate the facility to Langhorne. R.R. 182a–183a, 1513a–1515a, 2400a–2403a.

36. It states:

(a) **Unlawful coercive acts.**—It shall be a violation for any ... distributor ... to require, attempt to require, *coerce or attempt to coerce any new vehicle dealer in this Commonwealth to:*

\* \* \*

(4) Enter into any agreement with the manufacturer or *to do any other act prejudicial to the new vehicle dealer by threatening to terminate or not renew a franchise or any contractual agreement existing between the dealer and the manufacturer or distributor . . . .*

63 P.S. § 818.12(a)(4)(emphasis added). The Board, however, did not take any action against Subaru under this section.

37. As noted above in footnote 23, the Board adduced more evidence and made more factual findings than necessary to sustain Colonial's protest.

Subaru also violated the Act. Accordingly, Subaru's termination could not stand under Section 13(a) of the Act.[38]

### CONCLUSION

For these reasons, we affirm the decision of the Board.

### ORDER

AND NOW, this 19th day of February, 2004, the order of The State Board of Vehicle Manufacturers, Dealers and Salespersons dated October 17, 2002 in the above-captioned matter is hereby affirmed.