ROHRICH CADILLAC,
INC., Petitioner

v.

BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, STATE BOARD OF VEHICLE MANUFACTURERS, DEALERS AND SALESPERSONS, Respondent.

Commonwealth Court of Pennsylvania.

Argued June 17, 2013.

Decided July 11, 2013.

lapsed appeal rights. *Luke v. Cataldi,* 593 Pa. 461, 932 A.2d 45 (2007).

James P. DeAngelo, Harrisburg, for petitioner.

John B. Consevage, Harrisburg, for intervenor Bowser Cadillac, LLC.

BEFORE: McGINLEY, Judge, LEADBETTER, Judge, and COLINS, Senior Judge.

OPINION BY Senior Judge COLINS.

This matter is a dispute under the Board of Vehicles Act[1] between two competing Pittsburgh area Cadillac dealerships, Rohrich Cadillac, Inc. (Rohrich) and Bowser Cadillac, LLC (Bowser), over the relocation of Bowser's dealership. Rohrich petitions for review of an order of the State Board of Vehicle Manufacturers, Dealers and Salespersons (Board) that sustained a protest filed by Bowser against General Motors, LLC (GM) and directed GM to approve Bowser's request for relocation of its dealership. For the reasons that follow, we affirm.

Bowser operates a Cadillac dealership at 2670 Washington Road, McMurray, Pennsylvania, in Washington County just south of Allegheny County. (Board Final Adjudication and Order Findings of Fact (F.F. (¶¶ 2, 17.)) Rohrich's Cadillac dealership is located on West Liberty Avenue, Pittsburgh, Pennsylvania, approximately twelve miles from Bowser's current location, and is the Pittsburgh area's largest Cadillac dealership. (F.F. ¶¶ 6, 41, 45.) Rohrich's assigned area of responsibility is adjacent to Bowser's assigned area of responsibility. (F.F. ¶ 44.) The new location at issue here, 3260 Washington Road, McMurray, Pennsylvania, is within Bowser's assigned area of responsibility and within the same municipality and zip code, but is 2.8 air miles to the north of 2670 Washington Road, and would reduce the distance between the Bowser and Rohrich dealerships to 9.1 air miles. (F.F. ¶¶ 2, 25, 30, 41.) Both Bowser and Rohrich exceed GM's standards for satisfactory performance and are viewed by GM as successful dealerships. (September 18, 2012 Board Hearing Transcript (Sept. 18 H.T.) at 81, 213–14, R.R. at 133a, 265a–266a.)

GM has had an Essential Brand Elements (EBE) program since 2009 to encourage its Cadillac dealers to improve their facilities, under which it pays dealers approximately $800 per vehicle sold if their facilities are compliant with the EBE standards or they are progressing with facility improvements that will make them EBE compliant. (F.F. ¶ 50; Sept. 18 H.T. at

---

1. Act of December 22, 1983, P.L. 306, No. 84, *as amended,* 63 P.S. §§ 818.1–818.37.

113–14, 360–61, R.R. at 165a–166a, 412a–413a.) Rohrich's facility had not met GM's standards, but Rohrich in or about 2011 began building a new facility that meets those standards at its West Liberty Avenue, Pittsburgh Cadillac dealership location, and is therefore EBE compliant and receives the $800 per vehicle incentive from GM. (F.F. ¶¶ 48, 50; Exhibit P–52, R.R. at 1076a–1077a.) During the construction of the new facility, Rohrich has temporarily operated its Cadillac dealership from its Chevrolet dealership, also on West Liberty Avenue, Pittsburgh, slightly to the south and closer to Bowser's dealership. (F.F. ¶ 43; September 19, 2012 Board Hearing Transcript (Sept. 19 H.T.) at 547–49, R.R. at 598a–600a; Exhibit P–52, R.R. at 1076a–1077a.)

Bowser's dealership at 2670 Washington Road does not meet GM's facility standards, and because Bowser had not proceeded with construction of an improved facility that met GM's standards, it was not receiving EBE payments. (F.F. ¶¶ 19, 51.) Bowser does not own the 2670 Washington Road property and did not want to construct a new facility on property that it did not own. (F.F. ¶¶ 13, 24.) Bowser did not purchase the 2670 Washington Road property because the owner's asking price of $3 million was more than $1 million higher than what it felt was the market value. (F.F. ¶¶ 20–21.) Bowser also felt that it would be difficult and expensive to construct a new facility on the 2670 Washington Road property because the property has a stream running through it. (F.F. ¶¶ 22–23.)

In December 2011, Bowser had the opportunity to purchase 3260 Washington Road, McMurray, Pennsylvania, a flat property with good visibility, located at a four-way stoplight intersection, and Bowser's principal entered into a contract to purchase the 3260 Washington Road prop-erty for $2 million. (F.F. ¶¶ 25–27; Exhibit P–4, R.R. at 795a–815a.) The 3260 Washington Road property is located close to other non-Cadillac vehicle dealerships, including Lincoln, Acura and Volvo, all of which GM regards as competitors of Cadillac. (F.F. ¶ 27; Sept. 18 H.T. at 272, R.R. at 324a, Sept. 19 H.T. at 414–15, R.R. at 465a–466a.)

Bowser's dealer agreement with GM requires it to request and obtain GM's approval of any change in its dealership location. (Exhibit P–3, R.R. at 746a–749a.) In December 2011, Bowser submitted a request to GM for approval of the relocation of its dealership to 3260 Washington Road, McMurray, Pennsylvania. (F.F. ¶ 29.) In response to this request, GM suggested as alternatives a buy-out of Bowser's franchise or moving its Cadillac dealership to Bowser's Buick–GMC dealership in Pleasant Hills, to the east. (F.F. ¶¶ 64–66; Sept. 18 H.T. at 139–40, R.R. at 191a–192a; Sept. 19 H.T. at 463–67, R.R. at 514a–518a.) Bowser rejected GM's offers with respect to these alternatives. (F.F. ¶¶ 65–66.)

On February 7, 2012, GM issued a letter to Bowser denying its request to relocate its dealership. (F.F. ¶ 37; Exhibit P–1, R.R. at 730a–732a.) In this letter, GM listed six reasons for the denial: 1) it would cause a 16% reduction in Rohrich's "state expected sales;" 2) it would reduce the distance between Bowser and Rohrich to 8.7 miles, placing them "only minutes apart;" 3) it would negatively impact the Pittsburgh Multi Dealer Area (MDA) Cadillac Network because it would place Bowser into the Pittsburgh MDA, which had "minimal additional sales and registration opportunity for Cadillac;" 4) it would decrease customer convenience and sales to the south of Bowser's current location; 5) it "would create a significant risk to Cadillac dealers' opportunity to achieve a rea-

sonable return on investment;" and 6) it would negatively impact Cadillac's competitiveness against other luxury brands because dealers for other luxury brands are separated by distances of 17–23 miles. (Exhibit P–1, R.R. at 731a–732a; *see also* F.F. ¶ 38.)

On February 21, 2012, Bowser filed a protest with the Board, alleging that GM violated Section 12(b)(4) of the Board of Vehicles Act, which provides that manufacturers may not "[u]nreasonably withhold consent to the relocation of an existing new vehicle dealer." 63 P.S. § 818.12(b)(4). Rohrich petitioned to intervene in the protest proceeding, and the Board, over Bowser's objection, permitted Rohrich to intervene.

The Board heard two days of testimony concerning GM's reasons for denying the relocation request and whether those reasons were genuine concerns for the structure or competitiveness of the Cadillac dealer network, and received voluminous exhibits introduced by GM, Bowser and Rohrich.

With respect to effects of the proposed relocation on Rohrich and its ability to earn an adequate return on investment, Bowser's expert testified that GM used inconsistent methods to compare Rohrich's situation before and after the relocation to create its 16% percent reduction in Rohrich state expected sales. (Sept. 19 H.T. at 522–42, R.R. at 573a–593a.) As a result, GM characterized reductions attributable to Bowser's present location as effects of the proposed new location, and overstated the effect of the relocation three-fold. (Sept. 19 H.T. at 538–42, R.R. at 589a–593a.) GM's expert admitted that that state expected sales is a measure of market size, not projected lost sales, and that Rohrich's market area would still have a population substantially larger than Bowser's. (Sept. 18 H.T. at 268–69, 287–88,

R.R. at 320a–321a, 339a–340a.) GM's expert also testified that Rohrich with its new facility could be expected to have an increase in annual sales of 146 vehicles with Bowser at its current location, and did not opine that the Bowser relocation would create any risk to Rohrich or any other Cadillac's dealer's return on investment. (Sept. 18 H.T. at 234–36, 285–86, R.R. at 286a–288a, 337a–338a.). Bowser's expert testified that even with increased competition from Bowser's relocation and loss of some sales to Bowser, under GM's figures, Rohrich would still be expected to have an increase in annual sales of approximately 100 vehicles. (Sept. 19 H.T. at 565–66, R.R. at 616a–617a.) GM admitted that Rohrich was the only Cadillac dealer affected by Bowser's proposed relocation. (Sept. 18 H.T. at 111–12, R.R. at 163a–164a.)

With respect to the distance between the dealerships, there was evidence that GM exaggerated the effect of the move by using road miles for the change in distance, while using air miles and Rohrich's nearer temporary location in calculating the distance between Bowser's proposed location and Rohrich. (Sept. 19 H.T. at 542–48, R.R. at 593a–599a.) GM's characterization of the new location and Rohrich's dealership as "only minutes apart" was contradicted by testimony that the road between the dealerships is a congested road with numerous stoplights and that the driving time between Rohrich's dealership and Bowser's proposed location is at least 25–35 minutes depending on traffic. (Sept. 18 H.T. at 304, 335, R.R. at 356a, 387a; Sept. 19 H.T. at 428, 550, R.R. at 479a, 601a.)

With respect to GM's claim of impact on the Pittsburgh MDA Cadillac dealer network and lack of additional sales opportunity in the Pittsburgh market, GM admitted that Bowser's move would not change

the number of dealers in the Pittsburgh MDA and that Bowser at its current location was already one of four dealers in the Pittsburgh market regardless of its relocation. (Sept. 18 H.T. at 132, 170, R.R. at 184a, 222a.) GM's expert testified that there was additional Cadillac sales opportunity in the Pittsburgh market of 125 vehicles per year. (Sept. 18 H.T. at 233–35, 280, R.R. at 285a–287a, 332a.)

GM's assertion that the relocation would decrease customer convenience and sales to the south was contradicted by GM's expert's admission that there was no significant effect on customer convenience from the relocation and that there are no census tracts to the south that have the median income suitable for Cadillac sales. (Sept. 18 H.T. at 263–65, 270–71, 285, R.R. at 315a–317a, 322a–323a, 337a.) It was also contradicted by GM's own actions— GM had offered to buy out Bowser's dealership altogether and suggested moving it to the east (Sept. 18 H.T. at 139–40, 150–55, R.R. at 191a–192a, 202a–207a; Sept. 19 H.T. at 463–67, R.R. at 514a–518a), both of which would have reduced coverage to the south of Bowser's current location. With respect to the greater distance between dealers of other luxury brands, GM admitted that those brands have substantially fewer dealers than Cadillac and that GM has approved other relocations that shortened the distance between Cadillac dealers to nine miles or less. (Sept. 18 H.T. at 123–24, 128–30, R.R. at 175a–176a, 180a–182a.) GM's expert did not conclude that the Bowser relocation would have any negative impact on Cadillac's competitiveness with other brands. (Sept. 18 H.T. at 285–86, R.R. at 337a–338a.)

In addition, a January 18, 2012 email from one the GM decision-makers ex-pressed no objection to Bowser's proposed relocation other than concern that Rohrich would be upset and stated that "[t]his is complex, because we can't really block Bowser either, unless we offer to pay the difference in the property acquisition price (where he currently is)." (Exhibit P–40, R.R. at 985a.) The evidence also showed that GM discussed Bowser's request for relocation with Rohrich and determined what alternatives it was willing to propose to Bowser based on Rohrich's approval. (Sept. 18 H.T. at 138–40, 181, 342–43, R.R. at 190a–192a, 233a, 394a–395a.)

On December 5, 2012, the Board issued a final order sustaining the protest and directing GM to approve the relocation request, supported by a 36–page opinion. In its opinion, the Board specifically found the testimony of Bowser's expert witness credible. (Board Adjudication at 31.) The Board analyzed each of GM's reasons for the denial and concluded that they were outcome driven, manipulated the data and were not consistent with the evidence. (Board Adjudication at 31–35.) The Board held that GM did not conduct an honest, objective analysis of the proposed relocation and that GM's denial was therefore unreasonable, in violation of Section 12(b)(4) of the Board of Vehicles Act. (Board Adjudication at 31, 35–36.)

On January 4, 2013, Rohrich filed the instant petition for review appealing the Board's order.[2] Bowser intervened in this appeal and argues in support of the Board's order. GM did not file any petition for review of the Board's order, and has not sought reversal of the Board's order or participated in any way in this appeal.

2. Rohrich also filed a Motion for Supersedeas, which this Court denied on February 1, 2013.

This Court's review of the Board's order is limited to determining whether the Board violated constitutional rights, whether the order is in accordance with existing law, or whether necessary findings of fact are not supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Subaru of America, Inc. v. State Board of Vehicle Manufacturers, Dealers & Salespersons,* 842 A.2d 1003, 1007 n. 8 (Pa.Cmwlth.2004).

Section 12(b) of the Board of Vehicles Act provides in relevant part:

> It shall be a violation of this act for any manufacturer, factory branch, distributor, field representative, officer, agent or any representative whatsoever of such manufacturer, factory branch or distributor licensed under this act to:
>
> * * *
>
> (4) Unreasonably withhold consent to the relocation of an existing new vehicle dealer. . . .

63 P.S. § 818.12(b)(4). In this protest proceeding, the burden of proof was on GM to show that its refusal to consent to the relocation was reasonable, not on Bowser to show that the denial was unreasonable. Section 8(d)(3) of the Board of Vehicles Act, 63 P.S. § 818.8(d)(3) ("It shall be the burden of the automobile, motorcycle or truck manufacturer to prove it has not violated any provision of this act as set forth in the protest filed by the new vehicle dealer").

■ The Board of Vehicles Act does not define the terms "unreasonable" or "reasonable." The legislature, however, has instructed that the Board of Vehicles Act is intended "to promote fair dealing and honesty in the vehicle industry and among those engaged therein without unfair or unreasonable discrimination or undue preference or advantage." *Gabe Staino Motors, Inc. v. Volkswagen of America, Inc.,* No. Civ. A. 99–5034, 2005 WL 1041196, at *13 (E.D.Pa. Apr. 29, 2005) (quoting S.B. 808, 1996–27, 180th Gen. Assem., Reg. Sess. (Pa.1996)). In other franchise contexts, our courts have held that a franchisor is required to deal with franchisees "in good faith and in a commercially reasonable manner," *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 378, 390 A.2d 736, 742 (1978), and that "good faith" requires "honesty in fact in the conduct or transaction concerned." *Loos & Dilworth v. Quaker State Oil Refining Corp.,* 347 Pa.Super. 477, 500 A.2d 1155, 1160–61 (1985). A vehicle manufacturer's conduct that fails to meet standards of good faith and honesty may therefore properly be found unreasonable under the Board of Vehicles Act. *See Gabe Staino Motors,* 2005 WL 1041196, at *12; *see also C. Earl Brown, Inc. v. State Board of Vehicle Manufacturers, Dealers & Salespersons,* 124 Pa.Cmwlth. 205, 555 A.2d 314, 317 (1989).

■ Rohrich does not dispute that reasonableness under the Board of Vehicles Act requires good faith and honesty. (Petitioner's Brief at 18–20.) Instead, Rohrich argues that the Board committed errors of law because it allegedly required that GM be "perfect" or "correct" in its decision and allegedly "substituted its own business judgment for GM's." (Petitioner's Brief at 2, 21–30, 42–46, 49, 51–52.)[3] The

---

3. In its Petition for Review, Rohrich also asserted that the Board erred because it did not apply the factors prescribed by Section 27(c) of the Board of Vehicles Act for evaluating dealership relocations and that the Board's decision is not supported by substantial evidence. (Petition for Review ¶¶ 9(b), 10(b), (c).) Rohrich did not pursue either of these arguments in its Brief or at oral argument, and they are therefore waived. In any event, neither of these arguments has merit. Section 27 of the Board of Vehicles Act does not

flaw in this argument is that it disregards and misstates the Board's findings and reasoning.

■ Contrary to Rohrich's characterizations, the Board did not sustain the protest on the ground that GM's reasons were erroneous or that it made a wrong decision. Rather, the Board concluded that GM acted unreasonably because the reasons it gave for the denial were not genuine and GM therefore did not act in good faith and honestly in denying the relocation request. The Board in its opinion analyzed the evidence with respect to each of the reasons given by GM and found that the denial was unreasonable because those reasons were replete with overstatements and inconsistent calculation methods, unsupported by GM's own evidence, and outcome driven. (Board Final Adjudication at 15–17, 31–36.)

The Board's conclusion that GM acted unreasonably is thus completely consistent with the cases that have upheld manufacturers' actions as reasonable under the Board of Vehicles Act and other states' vehicle dealer statutes. None of those cases relied on by Rohrich involved findings that the manufacturers' articulated reasons were contradicted by their own witnesses and decision-makers or that methods they used were inconsistently applied or manipulated. See Gabe Staino Motors, 2005 WL 1041196, at *13–*16 (withholding consent to transfer of dealership was reasonable where new facility was inadequate and manufacturer had bad past experience with proposed transferee); Richard Subaru, Inc. v. Subaru of New England, 8 F.Supp.2d 164 (D.Conn.1998) (manufacturer's termination of dealer was in good faith where dealer violated dealer-

ship agreement and manufacturer's position with respect to importance of agreement's provision was genuine); Ed Koehn Nissan, Inc. v. Nissan Motor Corp., No. 1:93:CV:415, 1994 U.S. Dist. LEXIS 11575 at *8–*9 (W.D. Mich. June 22, 1994) (manufacturer's denial of consent to sale involving relocation was reasonable where manufacturer applied its procedures and standards consistently). In General Motors Corp. v. Dealmaker LLC, No. 07–CV–141, 2009 WL 1310616 (N.D.N.Y. May 8, 2009), the court did not hold that the denial of relocation was reasonable under a state vehicle dealer statute; rather, the court ruled that the statute in effect at the time did not apply to dealer relocations and the denial was upheld only under the terms of the dealer agreement. 2009 WL 1310616, at *5. There was also no suggestion in Dealmaker of any inconsistency or manipulation of data in the manufacturer's decision.

■ Rohrich also contends that the Board, in finding Bowser's expert's testimony credible, held that GM was required to use particular methodologies and data in evaluating the relocation request. (Petitioner's Brief at 31–37.) This argument, too, is contrary to the record. Bowser's expert's testimony was that GM's analysis used inconsistent data and methods, and was not merely an alternative analysis of the relocation. The Board, in finding Bowser's expert's testimony credible and basing its decision on his testimony, did not require GM to use a particular database or method in analyzing relocation requests.

For the foregoing reasons, we affirm the order of the Board.[4]

apply to this relocation because Bowser's new site is more than five miles from Rohrich's dealership. 63 P.S. § 818.27(b)(1). It is also

clear that the Board's findings are supported by substantial evidence.

4. Bowser has made an additional argument that Rohrich lacks standing to appeal the

## ORDER

AND NOW, this 11th day of July, 2013, the order of the State Board of Vehicle Manufacturers, Dealers and Salespersons in the above matter is affirmed.

Board's order because Bowser's proposed location is nine miles from Rohrich's dealership. (Intervenor's Brief at 53–56.) The Board of Vehicles Act protects dealers from harm from a competitor's relocation only where the competitor moves to a site within five miles of the other dealership. 63 P.S. § 818.27(b)(1). Rohrich therefore does not have standing to bring a challenge to Bowser's relocation or prevent GM from permitting Bowser to move. *Trailmobile, Inc. v. State Board of Manufacturers, Dealers & Salespersons*, 148 Pa.Cmwlth. 600, 612 A.2d 574, 576–78 (1992). The issue here, however, is whether Rohrich's interest is sufficiently "directly affected" and "appropriate to the administration of the statute" to permit it standing as a party, 1 Pa.Code § 35.28, and whether that remains the case where the party whose rights it asserts does not contest the Board's order. Rohrich's lack of standing to file a protest may not necessarily resolve the sufficiency of its interest to support standing as an intervenor. *See Pennsylvania Automotive Association v. State Board of Vehicle Manufacturers, Dealers & Salespersons*, 121 Pa. Cmwlth. 352, 550 A.2d 1041, 1044 (1988). Bowser, however, has filed no application to quash the appeal and raises the issue only as an additional ground for its position that the Board's order should stand. We therefore need not resolve this question.